**Samuel GREENBERG and Right-Gard Corporation**

v.

**CROYDON PLASTICS CO., INC., et al.**

**Civ. A. No. 72–832.**

United States District Court,
E. D. Pennsylvania.

June 27, 1974.

Max R. Millman, Morton C. Jacobs, McClure, Millman & Jacobs, Philadelphia, Pa., for plaintiffs.

Eugene E. Renz, Jr., Lewis F. Gould, Jr., Howson & Howson, Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

This is in part a suit for infringement of United States Letters Patent No. 3,411,501 ("Greenberg '501"), of which plaintiff Greenberg, a citizen of Pennsylvania, is the owner and Right-Gard Corporation ("Right-Gard"), a Pennsylvania corporation, the exclusive licensee. Plaintiffs also complain of trade secret misappropriation and misuse, conspiracy to infringe the patent and to misappropriate trade secrets, inducement to infringe the patent in suit, unfair competition and trade libel. We have jurisdiction under 28 U.S.C. § 1338(a) and (b). We denied plaintiffs' motion for a preliminary injunction and ultimately had a non-jury trial on these issues.

## I. *Factual Background*

In order to place plaintiffs' contentions in perspective, it is necessary to present a brief overview of the facts of

the case. Further findings of fact will be made as we reach the merits of each of their claims.

The patent in suit describes a mouthguard made of thermoplastic material which is to be worn by athletes for the protection of their teeth during sporting events. Right-Gard Corporation, a small company of which plaintiff Greenberg is the president, has been manufacturing flavored and unflavored versions of this mouthguard. For five years, until November 1971, defendant Dobrowolski was employed by Right-Gard and managed its sales operations. In the course of his employment, Dobrowolski became thoroughly familiar with every phase of Right-Gard's business, including the technical aspects of mouthguard manufacturing. Dobrowolski left Right-Gard in November 1971 to become the east coast sales representative for Safe-Play Manufacturing Co., Inc. ("Safe-Play"), a Nebraska corporation which had sold athletic equipment such as pennants and line markers but which, until Dobrowolski's arrival, had never been in the mouthguard business.

About two weeks after he started working for Safe-Play, Dobrowolski and the president of Safe-Play discussed the possibility of manufacturing mouthguards. Dobrowolski contacted Croydon Plastics Co., Inc. ("Croydon"), a Pennsylvania corporation, which had at one time molded mouthguards on a subcontracting basis for Right-Gard, and asked Croydon president Eugene Grzesnikowski for a quotation on the cost of tooling and molding mouthguards. Croydon quoted a price and ultimately manufactured and delivered to Safe-Play the mouthguards which are alleged to infringe the patent in suit. Safe-Play advertised, marketed and distributed these mouthguards under the name Power Cushion Models 800, 801, 802 and 803, with and without flavoring. Plaintiffs then instituted this lawsuit seeking a preliminary injunction, which we denied, and permanent injunctive relief and damages.

## II. Patent Cause of Action

Claim 9 of the Greenberg '501 patent, which plaintiffs allege has been infringed by defendants' mouthguards, describes the mouthguard as follows:

"A preformed saddle for use in making a mouthpiece comprised of a substantially U-shaped member of channel cross-section including an outer flange, a lingual flange and a web joining them and made of a plastic such that at a predetermined temperature range below that of boiling water the saddle will retain its essential shape but will be soft enough to take teeth impressions and to retain the teeth impressions below the softening range, the web having a mean thickness exceeding that of the outer and lingual flanges so that when the inner surface of the web contains the impressions of one set of teeth and the outer surface of the web contains impressions of the bite surface of the opposite set of teeth, a thickness of material is present in the web between impressions to protect both sets of teeth."

■ Defendants assert as a defense to the infringement claim that Claim 9 of the Greenberg patent is invalid and that even if it is valid, the Safe-Play mouthguards do not infringe. We have concluded that the subject matter of Claim 9 would have been obvious at the time of invention to a person of ordinary skill in the art of making mouthguards and therefore that Claim 9 of the patent in suit is invalid under 35 U.S.C. § 103. Because of this conclusion we find it unnecessary to reach the question of infringement, nor need we pass on the other grounds defendants have asserted in support of their defense of invalidity.[1]

Congress has prescribed a three-pronged test for patentability: novelty,

1. I. e., anticipation, failure to define the invention, late claiming and false oath of the inventor.

utility and nonobviousness. The test of obviousness is contained in § 103 of the Patent Act of 1952, 35 U.S.C. § 103, which provides in relevant part:

"A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

The criteria for determining obviousness or nonobviousness under § 103 were set out by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S. Ct. 684, 694, 15 L.Ed.2d 545 (1966):

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. * * * Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

The prior art at the time of Mr. Greenberg's invention was such that Claim 9 must be held invalid for obviousness. An examination of two prior mouthguard patents, Grossberg Patent No. 3,211,143 and Cathcart et al. Patent No. 2,966,908, makes this conclusion unavoidable, especially in light of plaintiff's own testimony at trial.[2]

Grossberg teaches a mouthguard with a U-shaped member of channel cross-section, an outer flange, a lingual flange and a web joining them. It is made of a thermoplastic material which can be softened at a molding temperature of between 120° and 160° Fahrenheit. The

only discernible difference between Claim 9 of the patent in suit and Grossberg, and the only difference plaintiff himself was able to point to at trial, is that the Greenberg mouthguard has a web thick enough to take impressions of one set of teeth and of the bite surface of the other set, while the web described in Grossberg will only take impressions of one set of teeth.

Claim 9 of the patent in suit teaches a web "having a mean thickness exceeding that of the outer and lingual flanges." This prescribed measurement does not have an arcane mystical significance. It is merely a way of describing a web thickness which will provide enough material to take impressions of one set of teeth and of the bite surface of the opposite set and prevent the wearer from biting through during fitting, but which at the same time will not be so thick that after fitting the player will find himself unable to talk or breathe with ease.

Since the Greenberg mouthguard is in every other respect identical to that of Grossberg, the crucial question is whether thickening the web in this manner would have been obvious to a person such as Mr. Greenberg who was skilled in the art. We have concluded that the teachings of Cathcart et al. would have made the thickened web obvious.

Cathcart et al. teaches a thickened web. The structural configuration of the Cathcart mouthguards is in all respects save one identical to that of the Greenberg mouthguards. The mouthguard disclosed in Cathcart is a substantially U-shaped member of channel cross-section having an outer flange, a lingual flange and a web joining them. The web taught by Cathcart has a thickness ranging from 3mm. at the ends to approximately 5mm. at the incisors, or a mean thickness of 3mm. Since the flanges of the Cathcart mouthguard have a thickness of 2mm., Cathcart

2. "The prior art includes all pertinent prior art whether or not the patentee knew of it. [Citations omitted.]" Arrow Safety Device

Co. v. Nassau Fastening Co., 496 F.2d 644 (C.A. 3, filed March 28, 1974).

teaches a mean web thickness exceeding that of the flanges. The one significant difference between the Cathcart mouthguards and Greenberg's is that Cathcart teaches mouthguards which are made of a vinyl resin plastic and are ready-to-wear, while the Greenberg mouthguards are made of a thermoplastic which can be softened by heat and molded to the teeth of the wearer.

At the time of Mr. Greenberg's invention, he had before him prior art in Grossberg which disclosed every characteristic enumerated in Claim 9 of the patent in suit except the thickened web, and prior art in Cathcart which taught a thickened web in the proportions Mr. Greenberg ultimately specified in Claim 9. The question is whether it would have been obvious to a skilled artisan like Mr. Greenberg to combine the web thickness of Cathcart with the specifications of Grossberg to come up with Claim 9.

The conclusion that it would have been obvious is inescapable. Perhaps the most eloquent testimony on this point came from Mr. Greenberg's own lips at trial. In order to discover whether one skilled in the art, faced with the problem of not having enough material to take impressions of one set of teeth and of the bite surface of the other set without biting through, would come to the same conclusion an untutored layman would, we engaged in the following colloquy with Mr. Greenberg:

"Q. If you found that after softening the mouthguard and placing it into the mouth you bit through it and you didn't want to bite through it, that is through the web, what would be the first thing that would occur to you to prevent that?

"A. Well, I think of a few things. First, I have to thicken it, number 1.

"Q. That would be the first thing.

"A. Yes.

"Q. To thicken it.

"A. Right." (N.T. 252–253).

We can only conclude that the thickened web would have been obvious to one skilled in the art, either in view of the combined teachings of Grossberg and Cathcart et al. or because common sense would have led the skilled artisan to thicken the web of the Grossberg mouthguard if he wanted to take impressions of the bite surface of the opposite set of teeth and prevent the wearer from biting through during fitting.

▮ It should be noted that Grossberg was considered by the Patent Office Examiner when she passed on the claim at issue here. It is unclear whether she also considered Cathcart '908.[3] The statutory presumption of the validity of an issued patent under 35 U.S.C. § 282 is a strong one and requires a defendant asserting that it is invalid to meet a heavy burden of proof. Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F.2d 66 (C.A. 3, 1972). The presumption of validity is further strengthened by a showing that the prior art on which the assertion of invalidity is based was considered by the Patent Examiner. Skil Corp. v. Cutler-Hammer, Inc., 412 F.2d 821 (C.A. 7), cert. denied 396 U.S. 951, 90 S.Ct. 394, 24 L.Ed.2d 251 (1969); Scaramucci v. Dresser Industries, Inc., 427 F.2d 1309 (C.A. 10, 1970). The Patent Office, possessing as it does far more expertise in this area than do the courts, must be given the chief authority in determining whether a patent application meets the statutory standards. This does not

---

3. Grossberg No. 3,211,143 is included in the "Notice of References Cited" in the Official Action of April 3, 1968, in which certain of Greenberg's claims were rejected. In response to the rejection, Mr. Greenberg referred the Patent Office to a Cathcart patent but it is unclear whether he was referring to Cathcart No. 2,966,908, the one we have discussed here, or to one of Cathcart's other mouthguard patents. In any event, there is nothing in the history of Greenberg '501 to indicate with any certainty that the Patent Examiner considered Cathcart No. 2,966,908.

mean, however, that courts must blindly accept the Patent Examiner's determination even' if the attack on the patent's validity is based primarily or even exclusively on prior art which was considered by the Examiner in his decision to issue the patent. Hughes Tool Co. v. Ingersoll-Rand Co., 437 F.2d 1106, 1109 (C.A. 5), cert. denied 403 U.S. 918, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971). To do so, particularly in a case where an extremely strong showing of a patent's invalidity is made, would be to abdicate the responsibility that has, wisely or not, been entrusted to the courts. Courts do not often find a patent invalid on the basis of prior art which was considered by the Patent Office but they have, as they must, done so in appropriate cases. *E. g.,* Metallurgical International Inc. v. Kawecki Berylco Industries, Inc., 348 F. Supp. 825, 836 (E.D.Pa., 1972) (Fullam, J.). The evidence of obviousness is so compelling here that we cannot avoid the conclusion that the claim of the patent which was allegedly infringed by defendants is invalid under § 103, and therefore we shall enter judgment for the defendants on the patent infringement allegations.[4]

## III. *Trade Secret Cause of Action*

Right-Gard makes flavored mouthguards which, plaintiffs claim, are manufactured by methods that are protected trade secrets. They allege that Dobrowolski misappropriated Right-Gard's trade secrets and technological and business know-how; that Safe-Play and Croydon have used the misappropriated trade secrets and business know-how; and that the defendants all conspired to misappropriate and misuse the trade secrets and know-how. Plaintiffs seek injunctive relief and an accounting of profits and damages, including punitive and exemplary damages.

The allegedly misappropriated trade secrets fall into three categories: (1) the method of injection molding Alathon 3180 mouthguards generally, either with or without flavoring; (2) Right-Gard's customer lists, price lists and information about the general operation of Right-Gard's business; and (3) the technique of flavoring mouthguards made of Alathon 3180 Thermoplastic.

█ In order to obtain the relief they request, plaintiffs must prove the following:

"(1) Plaintiff is the owner of a trade secret.

"(2) Plaintiff disclosed the trade secret to defendant; or defendant wrongfully took the trade secret from plaintiff without plaintiff's authorization.

"(3) Defendant was in a legal relation with reference to plaintiff as a result of which defendant's use or disclosure of the trade secret to plaintiff's detriment is wrongful.

"(4) Defendant has used or disclosed (or will use or disclose) the trade secret to plaintiff's detriment; or, defendant, who knew or should have known of plaintiff's rights in the trade secret, used such secret to plaintiff's detriment." Milgrim, Trade Secrets § 7.07[1] (footnotes omitted). *See also* MacBeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86 A. 688 (1913); Pittsburgh Cut Wire Co. v. Sufrin, 350 Pa. 31, 38 A.2d 33 (1944); Wexler v. Greenberg, 399 Pa.

---

4. There was some testimony by plaintiffs which, albeit extremely vague, suggests that the Right-Gard mouthguards have enjoyed considerable commercial success and have satisfied a long-felt need in the mouthguard market. These considerations may of course be taken into account in determining obviousness or nonobviousness, Graham v. John Deere Co., *supra*, but they are to be given only measured weight. Anderson's-Black Rock v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); U. S. Expansion Bolt Co. v. Jordan Industries, Inc., 488 F.2d 566 (C.A. 3, 1973). "Commercial success without invention does not amount to patentability." Blohm & Voss AG v. Prudential-Grace Lines, Inc., 489 F.2d 231, 245, 180 USPQ 165, 176 (C.A. 4, 1973). These secondary considerations do not overcome the strong evidence of obviousness.

569, 160 A.2d 430 (1960); Van Products Co. v. General Welding and Fabricating Co., 419 Pa. 248, 213 A.2d 769 (1965).

■ The threshold question is obviously whether there was a trade secret at all. The concept of a trade secret is extraordinarily difficult to define. Comment b to § 757 of the Restatement of Torts is the most lucid attempt to date to define the elusive beast. Comment b states that "a trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Trade secret protection cannot be claimed for information which is common knowledge. On the other hand, the degree of novelty and invention that are required under the patent laws are not demanded of a trade secret. The secret may be no more than a slight mechanical advance over common knowledge and practice in the art.

■ The owner of a trade secret must take reasonable precautions to protect its secrecy. The secrecy in which a purported trade secret is shrouded need not be absolute but reasonable precautions under the circumstances must be taken to prevent disclosure to unauthorized parties. The degree of secrecy must be such that it would be difficult for others to obtain the information without using improper means.

Persons other than the owner may know the trade secret if they are employees involved in the manufacturing process in which the secret is used, or if they are nontechnical employees, who, because of the nature of their jobs, become familiar with the secret.

■ The owner of a trade secret, unlike the owner of a patent, does not have a monopoly over the process or formula. He is only protected from other persons' gaining access to it either by stealing it directly from him, or by having another to whom it was lawfully disclosed do so. Others in the field are free to arrive at precisely the same method and to use the method so long as they obtain their knowledge through their own independent efforts.

■ Two of plaintiffs' trade secret contentions may be disposed of quickly. The first is their claim of trade secret status for the technique of injection molding Alathon mouthguards generally. This method is not a trade secret. The injection molding techniques used to make plaintiffs' mouthguards were common knowledge in the plastics trade at the time of the alleged misappropriation. The only hint that it was not appears in the testimony of Mr. Kiss of Philadelphia Plastics. Kiss had at one time done injection molding of unflavored Alathon mouthguards for Right-Gard; he had subcontracted some of the Right-Gard work to Croydon. Kiss testified that when he "jobbed out" the mouthguard work to Croydon, he gave Grzesnikowski "specific" instructions on how to injection mold the mouthguards. But Grzesnikowski was experienced in injection molding and, although we have problems believing some of his testimony, we are convinced that he had long used the techniques employed in molding the mouthguards, and had used them with material similar or identical to what ultimately became known as Alathon 3180. We also find support in the language of Claim 9 of the patent in suit for the conclusion that the injection molding method was common knowledge. Claim 9 reads at Column 3, lines 15–16: "The saddle is readily and easily made by *conventional injection molding techniques.*" (Emphasis added.) Since plaintiffs' injection molding technique was common knowledge in the trade and could readily be known by any experienced artisan without improperly obtaining information about plaintiffs' procedures, it is not a protected trade secret.

■ We do not accord trade secret protection to plaintiffs' customer lists and general business know-how. Customer lists and other information about the operation of a business may under appropriate circumstances be

trade secrets. Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957); Van Products Co. v. General Welding and Fabricating Co., *supra;* National Chemsearch Corp. of Missouri v. Schultz, 173 U.S.P.Q. 218 (N.D.Ind.1972). *See generally* Milgrim, Trade Secrets § 2.09 [7] (1973). Dobrowolski admitted at his deposition that he sold Safe-Play mouthguards to some dealers to whom he had also sold Right-Gard mouthguards. There has been no showing, however, that these customers were culled from Right-Gard's secret customer lists rather than from the general store of contacts that Dobrowolski had built up in the course of thirteen years of selling athletic equipment[5] or from a list of potential customers with which Dobrowolski was supplied by another Safe-Play representative. The mere fact that some of Safe-Play's customers had also been customers of Right-Gard does not support a conclusion that Dobrowolski misappropriated Right-Gard's customer lists or that Safe-Play or Dobrowolski used them. On the basis of the record before us, we conclude that plaintiffs have "failed to show that this information was any more than the recorded results of [Dobrowolski's] acquisition of general knowledge and skill in this field." Van Products Co. v. General Welding and Fabricating Co., *supra*, 419 Pa. at 263, 213 A.2d at 777.

We turn now to the crux of plaintiffs' trade secret claim, *i.e.*, that the flavoring method they developed is a trade secret which was misappropriated by Dobrowolski and wrongfully used by Safe-Play and Croydon Plastics. Since all testimony concerning the flavoring method was taken *in camera* and all documents relating to it have, pursuant to a protective agreement of the parties and the court, been kept separate from the public papers in this case, we shall not describe the flavoring method in detail.

The threshold question is whether the flavoring process is a trade secret. We have concluded that it is. Before plaintiffs invented their flavoring method, there had been flavored mouthguards which could not be softened in water and fitted to the wearer's teeth and mouthguards which could be softened in boiling water and fitted to the wearer's teeth but which were not flavored. Plaintiffs finally, and for the first time, gave athletes a flavored mouthguard which could be softened in boiling water and retain its flavoring after one or more fittings. By eliminating the rancid taste a mouthguard takes on at midseason and replacing it with a long-lasting, refreshing mint, plaintiffs apparently met a need long felt by mouthguard wearers and thus gained a competitive edge over other mouthguard manufacturers. Their method has not been patented and may not be patentable,[6] but it is a mechanical advance which has placed Right-Gard in a better position in the marketplace than its competitors.

There was a considerable amount of testimony at trial on whether plaintiffs took adequate precautions to keep the flavoring method secret. While the secrecy maintained was not absolute, the precautions taken were reasonably calculated under the circumstances to preserve the secrecy of the method. The machine in which the flavoring was done was put in a corner of the Right-Gard plant as far as possible from the rest of Right-Gard's operations. The flavoring was actually done only by Mr. Greenberg, Research Director Abe Jacobs, and Jacobs' assistant. Although there were no signs designating the area around the

---

5. Mrs. Greenberg testified that while Dobrowolski was employed by Right-Gard he periodically took packing slips home and kept them for a long time. These packing slips allegedly contained customer information. We find this inconclusive: there has been no showing that it indicates anything more than that Dobrowolski was an avid worker who did some work at home after the normal working day.

6. A patent application has been filed but has apparently thus far been rejected by the Patent Office.

flavoring machine a restricted area [7] and the machine was not very far from the doors of the shipping area, it was an area quite clearly removed from the rest of the plant. At least one outsider, Mr. Kiss of Philadelphia Plastics, had been allowed to go back to the flavoring area when he visited the Right-Gard plant, but he was never there while the Alathon was actually being flavored. No one but a few Right-Gard employees ever saw the flavoring process.

On the basis of all the credible evidence before us, we conclude that the flavoring technique is a trade secret. We also conclude that it was disclosed to Dobrowolski. He was present during much of the experimentation that ultimately led to the successful flavoring method and was familiar with the essential elements of the process, as well as the reasons why other methods would bring unsatisfactory results.

This disclosure was made in the course of a confidential relationship, the nature of which would make disclosure of the secret to third parties wrongful. This confidentiality might be inferred from Dobrowolski's position as a key employee of a small firm who had to have some familiarity with the flavoring method in order knowledgeably to perform his sales function. But Dobrowolski's own understanding of his relationship to his employers makes the drawing of inferences unnecessary. At a deposition plaintiffs took of Dobrowolski shortly before trial, this exchange took place between plaintiffs' counsel and Dobrowolski:

"Q. Did anybody tell you in these discussions [about the flavoring method] that whatever they were experimenting with and whatever method they were trying to work out was to be kept secret and not get out of the plant?

"A. Naturally, yes.

"Q. You understood that?

"A. Sure—like anybody you would work for." (Dobrowolski Dep., April 7, 1973, N.T. 30–31.)

Plaintiffs have thus proved three of the four elements necessary for recovery, i. e., that there was a trade secret, that it was disclosed to Dobrowolski, and that Dobrowolski's relationship to plaintiffs was such that disclosure of it to others would be wrongful. They must also prove that Dobrowolski did disclose the flavoring method to Safe-Play or Croydon and that Safe-Play or Croydon used plaintiffs' trade secret to manufacture their flavored mouthguards.

Plaintiffs in trade secret cases, who must prove by a fair preponderance of the evidence disclosure to third parties and use of the trade secret by the third parties, are confronted with an extraordinarily difficult task. Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything. This is such a case.

The facts relating to misappropriation and misuse of the flavoring method which support plaintiffs' contentions describe the following chain of events. Shortly after Dobrowolski left Right-Gard and joined Safe-Play in November 1971, Safe-Play began planning to market athletic mouthguards. After receiving price quotations from at least one other plastics molder, Safe-Play decided to have Croydon mold its mouthguards. Sometime after its decision to enter the mouthguard market, Safe-Play decided to make and sell a flavored mouthguard.

7. Mrs. Greenberg testified that there were signs. In light of the testimony of other witnesses, including her husband, we do not believe her on this point.

It advertised the flavored mouthguard in its 1972 dealer price list and continued with its plans to market the flavored mouthguard despite a letter dated January 28, 1972 from plaintiffs' counsel warning that Safe-Play's flavored mouthguard would, when and if made, be a wrongful use of a secret flavoring process which had been improperly disclosed by Dobrowolski. Safe-Play's president asked Dobrowolski about the letter and was told that letters like that are sent all the time. The letter was never answered and the flavored Alathon mouthguard manufactured for Safe-Play by Croydon was ultimately put on the market.

Although the flavoring agent is slightly different from Right-Gard's and a minutely different quantity is used, the flavoring method used by Croydon to manufacture Safe-Play's flavored mouthguards is in all essential respects identical to the one Right-Gard developed. There is no evidence that defendants did any independent research to come up with a method for flavoring mouthguards. The only experimentation Croyden did was directed towards determining the proper amount of the flavoring ingredient. The decision to use the Right-Gard method was made without any prior experimentation,[8] despite the fact that the supplier of the flavoring agent recommended a technique which had been rejected by Right-Gard in the course of its experimentation. Defendants had apparently predetermined to use the Right-Gard method.

It is clear, therefore, that defendants used the same flavoring method as plaintiffs did, and an inference may be drawn from the facts as we have set them out that they used the method because Dobrowolski improperly disclosed plaintiffs' trade secret. This inference may be overcome by a showing by defendants that they arrived at the flavoring method independently.

Dobrowolski and Eugene Grzesnikowski of Croydon testified on this point. Dobrowolski's deposition testimony was in effect that he had discussed the general design of the mouthguard with the Grzesnikowskis at Croydon but that he did not tell them how to flavor them.[9] Dobrowolski is, of course, an interested party and his deposition testimony is not terribly specific. The testimony of Grzesnikowski, who was questioned fairly extensively at trial, is far more important. He testified that nobody, including Dobrowolski, told him how to flavor the mouthguards. The reason, according to Grzesnikowski, was that because he was an experienced injection molder, he already knew how to mix the flavoring into the Alathon 3180. He had in the past made a colored, scented plastic Christmas tree, a branch of which was introduced into evidence, and he had colored and scented them by using the same method Right-Gard used for flavoring mouthguards. He also testified that he had used the same technique for mixing poisons into a flea collar which was not offered as an exhibit. Grzesnikowski also testified that he had had the machine he used for flavoring the Alathon 3180 in his shop for approximately ten years.

Defendants' assertions of independent development must stand or fall largely on Grzesnikowski's testimony, which

8. Mr. Spieker, the president of Safe-Play, testified at a deposition taken before the Safe-Play mouthguards actually went on the market that he was experimenting with some flavoring techniques at Safe-Play's offices in Nebraska. However, since Spieker has absolutely no background in either plastics or mechanical dentistry and was totally unfamiliar with the technical terms commonly used in the mouthguard field, we attach little weight to his testimony about his own experiments.

9. Dobrowolski was present in the courtroom throughout the trial but he was not called to testify. His deposition was taken twice, once in 1972 and once in 1973, and counsel for both sides stipulated to the admissibility of the depositions. This procedure, which we accepted because it was agreeable to the parties, has not aided us in judging Dobrowolski's credibility as a witness.

raises serious problems of credibility. Grzesnikowski was not a believable witness. His testimony is shot through with inconsistencies and his general demeanor as a witness, even making allowance for certain problems that were probably due mainly to personality factors and unfamiliarity with court proceedings, does not lead us to give what he said a great deal of weight. Grzesnikowski was not a model of clarity. He was extremely vague about chronology, admitting freely that he is not good at names and dates. One of the major inconsistencies was his testimony about his experience in making flavored mouthguards, which relates directly to the question of independent development. Grzesnikowski stated at his June 26, 1972 deposition that he had never seen a flavored mouthguard. At a second deposition in April 1973, he said that he had made 50 or 100 or "a few" flavored mouthguards for Mr. Kiss of Philadelphia Plastics six or seven years earlier. Then at trial he testified that he had made "approximately 50 or so" flavored mouthguards for Kiss about four or five years earlier. Kiss, whom plaintiffs called as a rebuttal witness, and whom we found to be an extremely forthright and direct witness, flatly denied that he had ever asked Grzesnikowski to make a flavored mouthguard.

Grzesnikowski was similarly if less dramatically vague on when and for what purpose the scented Christmas tree had been developed. He also produced no samples of the flea collar he claimed he made and offered no documentation to prove that he had done so.

This was the general tenor of Grzesnikowski's testimony. It was, as we have noted, not overly worthy of belief. However, even if we assume that Grzesnikowski did use the method at issue here to mix coloring or scent into plastic Christmas trees or flea poison into dog collars, there is absolutely no credible testimony that he had ever used this mixing method to create a device made of Alathon which could retain its shape when softened in water and hold its fla-

vor after such softening. There is no evidence, in other words, which suggests that Grzesnikowski's previous experience would lead him immediately to a method of flavoring mouthguards which plaintiffs arrived at only after extensive experimentation.

Although the factual question is a difficult one, turning as it does largely on issues of credibility, we conclude that plaintiffs have proved by a fair preponderance of the evidence that defendants did not arrive at the flavoring method through independent investigation. We find instead that Dobrowolski, to whom the technique was disclosed in the course of a confidential relationship, disclosed the procedure to Croydon and Safe-Play and that Safe-Play's flavored mouthguards were manufactured with the secret flavoring method which was misappropriated from plaintiffs.

## IV. Relief

The only relief to be awarded in this case relates to the misappropriation of plaintiffs' secret flavoring method.

■ We shall enjoin each of the defendants from disclosing and using plaintiffs' secret flavoring method and from making, offering for sale or selling flavored mouthguards which have been flavored by the secret flavoring method. This does not mean that defendants may not manufacture, offer for sale or sell flavored mouthguards made with a flavoring technique they may have discovered or will in the future discover independently; nor, of course, does it mean that other persons or firms not parties to this lawsuit will be prevented from using a flavoring method identical to that used by plaintiffs, so long as they discover it independently.

Plaintiffs have also requested monetary relief, including an accounting of profits and damages (by which we assume they mean compensatory damages), punitive damages, and recovery of costs and attorneys' fees.

"There are two basic methods for assessing damages for misappropriation

of trade secrets: one, the damages sustained by the victim (the traditional common law remedy), and the other, the profits earned by the wrongdoer by the use of the misappropriated material (an equitable remedy which treats the wrongdoer as trustee *ex maleficio* for the victim of the wrongdoer's gains from his wrongdoing). R. Ellis, Trade Secrets § 286 (1953); Restatement of the Law of Torts §§ 746 and 747 (1938); R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 59.3 (1965)." Sperry Rand Corporation v. A–T–O, Inc., 447 F.2d 1387, 1392 (C. A. 5, 1971).

An accounting of Safe-Play's profits from its misuse of plaintiffs' trade secret is appropriate here. Plaintiffs have not proved the actual damages they have suffered as a result of defendants' misappropriation and misuse of their secret flavoring method. Proof of actual losses sustained by the plaintiff is frequently difficult and speculative in trade secret cases, *see* J. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 59.3 (3rd ed., 1968); it is nearly impossible here. However, a twofold goal is achieved by requiring Safe-Play, which was the ultimate beneficiary of both its own wrongful acts and those of the other defendants, to return to plaintiffs the profits it has earned as a result of its misuse of the trade secret. An accounting forces Safe-Play to disgorge its wrongfully earned profits and at the same time serves to compensate plaintiffs for the injury they have suffered.

The same considerations that dictate an accounting of profits by Safe-Play lead to the conclusion that Dobrowolski account for his profits arising from his misappropriation of the trade secret, *i. e.*, his commissions on his sales of flavored mouthguards made with Right-Gard's secret flavoring method. He will be ordered to account for his commissions.

This is not an appropriate case for the award of punitive damages. Defendants' conduct, while wrongful, has not been shown to be of such an outrageous or egregious nature as would justify an award of punitive damages.

We turn finally to plaintiffs' request for costs and attorneys' fees. The award of costs rests within the sound discretion of the trial court. Solo Cup Co. v. Paper Machinery Corp., 359 F.2d 754, 760 (C.A. 7, 1966). Normally each party bears its own costs; we can see no reason to deviate from that general rule here. While it is true that plaintiffs have sued in part to protect a trade secret that we have found to be misappropriated by defendants, that is by no means the entire substance of this litigation. They have also sued for the alleged infringement of a patent we have held is invalid; for protection of two alleged trade secrets which we have held are not trade secrets; and for various other counts of unfair competition, trade libel and conspiracy which have not been proved. Under these circumstances we think it best that each party bear its own costs.

We are of the same opinion with regard to counsel fees.

"Although the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require. * * * [F]ederal courts do not hesitate to exercise this inherent equitable power whenever 'overriding considerations indicate the need for such a recovery.' Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391–392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593. * * * Thus, it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' 6 J. Moore, Federal Practice ¶ 54.77[2], p. 1709 (2d ed.

1972); * * * In this class of cases, the underlying rationale of 'fee shifting' is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant." [Citations and footnotes omitted." Hall v. Cole, 412 U.S. 1, 4–5, 93 S.Ct. 1943, 1945, 36 L. Ed.2d 702 (1973). *See also* Lichtenstein v. Lichtenstein, 481 F.2d 682 (C.A. 3, 1973).

These principles apply to trade secret cases. The Seventh Circuit, reversing a district court's award of counsel fees in a trade secret misappropriation case, noted the general policy of both state and federal courts not to award counsel fees in the absence of an agreement or statutory authorization except "when overriding considerations of justice compel them," and found "no general federal rule or policy" favoring the award of counsel fees to prevailing plaintiffs in trade secret cases. Forest Laboratories, Inc. v. Pillsbury Co., 452 F.2d 621, 628 (C.A. 7, 1971). We can discern no overriding considerations here which would lead us to award attorneys' fees to plaintiffs and absent any special policy in trade secret litigation in favor of such an award, we decline to grant plaintiffs' request.[10]

### V.  *Conspiracy*

 No evidence has been adduced which could possibly support plaintiffs' conspiracy claims. The contention that there was a conspiracy to infringe the patent is based on ephemeral speculation which we need not discuss. Nor is there any basis for the claim of inducement to infringe the patent in suit. We are unable to discern any basis in the record for the claim that there was a conspiracy to misappropriate the trade secrets and plaintiffs have provided no enlightenment in their briefs.

### VI.  *Trade Libel and Unfair Competition Other Than Trade Secret Misappropriation*

Plaintiffs' claims of trade libel and allegations of unfair competition other than trade secret misappropriation are devoid of any factual foundation. Since they have not briefed these issues, they appear to have abandoned their contentions. However, whether they have or not, we shall enter judgment for defendants on these counts.

The foregoing shall constitute our findings of fact and conclusions of law.

10. We need not decide whether federal law or Pennsylvania law applies to this question, for there is no difference in the law of the two jurisdictions in this area. Lichtenstein v. Lichtenstein, *supra*, 481 F.2d at 684, n. 1.