**REINFORCED MOLDING CORPORATION,**
Plaintiff,

v.

**GENERAL ELECTRIC COMPANY, a corporation, Defendant.**

Civ. A. No. 81–183.

United States District Court,
W.D. Pennsylvania.

Aug. 21, 1984.

**1084**

Henry E. Rea, Jr., Brandt, Milnes, Rea & Wagner, Pittsburgh, Pa., for plaintiff.

Frederick N. Egler, Egler, Anstanding, Garrett & Riley, Pittsburgh, Pa., for Defendant.

## OPINION

MANSMANN, District Judge.

This matter comes before the Court for resolution on the merits after trial nonjury. In conformity with the findings of fact and conclusions of law set forth below, this Court finds that Defendant misappropriated Plaintiff's trade secret and awards Plaintiff damages in the amount of $1997.05. This Court further finds that the record does not support an award of punitive damages and denies this request by Plaintiff.

This Court hereby makes the following findings of fact and conclusions of law pursuant to FED.R.CIV.P. 52(a):

## FINDINGS OF FACT

1. Plaintiff, Reinforced Molding Corporation is a Pennsylvania corporation engaged in the business of manufacturing reinforced fiberglass products, among other items. Edward J. Sinnott ("Sinnott") is Plaintiff's founder and president.

2. Defendant, General Electric Company is a New York corporation which manufactures, *inter alia*, electrical alternators for use in large off-road vehicles at its plant in Erie, Pennsylvania.

3. This action was commenced in the Court of Common Pleas of Allegheny County, Pennsylvania, and was removed to this Court on the petition of the Defendant pursuant to 28 U.S.C. § 1441, based upon diversity of citizenship.

4. Plaintiff seeks damages from Defendant, claiming that Defendant misappropriated its trade secrets concerning the manufacturing process of coil brace parts (used by Defendant in its manufacture of electrical alternators).

5. Defendant filed a counterclaim based upon allegedly unpaid invoices submitted to the Plaintiff, but has since withdrawn the counterclaim when Plaintiff produced documents at trial which evidenced payment.

6. Defendant manufactures and sells electrical alternators for use in large off-road vehicles. The alternators consist of electrical coils which must be kept separated and insulated. During operation of the alternators, due to centrifugal forces, the electrical coils tend to migrate towards one another. The coil brace part which is the subject of this lawsuit separates and insulates these coils.

7. The concept of coil brace parts and its "preferred embodiment" is the subject of a General Electric patent dated December 12, 1971, patent no. 3,740,600 also known as the "Turley Patent."

8. Prior to the time that Plaintiff became involved in the making of coil brace parts, Defendant utilized a metal coil brace part which, for various reasons, became unsatisfactory.

9. In 1971, Defendant created design drawing No. 41A237239 which illustrates the configuration of the coil brace part.

The drawing further specifies that the material to be used is "polyester resin glass impregnated purchased from Reinforced Molding ... or equivalent."

10. In 1971 Defendant approached Sinnott with the drawing referenced above and asked him if he could "create" a coil brace part which would be suitable for use in the alternators of the off-road vehicles.

11. Sinnott worked on the product for approximately one year, and within six months he brought a sample coil brace part to Defendant's plant in Erie. Sinnott was assured that he was "on the right track" but told that the product still needed work. By the end of one year, the product was developed to Defendant's satisfaction.

12. During the period of product development, Sinnott spent the most time ascertaining appropriate materials and researching optimal combinations and proportions. Although Defendant evaluated the end product, supplied the configuration and suggested the general material, it did not have other input, nor know of details of the manufacturing process.

13. In 1971, Plaintiff began to manufacture coil brace parts for Defendant and was its sole vendor. In accordance with their oral agreement, Plaintiff did not sell this part to others.

14. Plaintiff manufactured the coil brace by means of a pultrusion molding process utilizing fiberglass cloth and fiberglass roving as the reinforcing materials. The Plaintiff's process involved the pulling of glass cloth and rovings through a resin bath so as to impregnate these materials. The materials were subsequently drawn through a heated mold in a continuous motion which had the effect of curing the materials, resulting in a rigid end product which was then cut to size.

15. The pultrusion process is general knowledge in the industry. However, the special combination of the various ingredients used by Plaintiff in its manufacturing process was not general knowledge in the industry, although the materials and ingredients themselves were "readily available" and not a trade secret.

16. The shape of the cavity portion of the mold used by the Plaintiff to manufacture the coil brace for Defendant was specifically designed to conform to the configuration and dimensions supplied to Plaintiff by Defendant.

17. One of the specifications of the coil brace part was that it was required to meet a specific performance criterion in a pull test administered by Defendant. Although the record is not clear on the original requirements, in 1978 the increased specifications required the brace part to pass a pull test of 100 pounds per inch.

18. During this same year Plaintiff experienced difficulty in obtaining the 2½ inch woven fiberglass tape used in its manufacturing process and was unable to find a suitable substitute.

19. From 1971 through 1977 if a particular brace part was not "up to specs", it would be rejected by the Defendant and replaced by the Plaintiff. During this period less than five per cent of all parts shipped were rejected.

20. However, in 1978, probably due to an increase in Defendant's pull test requirements and Plaintiff's difficulty in obtaining the 2½ inch woven fiberglass tape, Plaintiff experienced difficulty in producing the required quantity of coil brace parts which would meet Defendant's newly imposed strength requirements.

21. As indicated above, Plaintiff's coil brace part was used to separate and insulate electrical coils contained in electric alternators used in very large off-road vehicles. These electric alternators were sold by General Electric for thousands of dollars.

22. The brace part, although comparatively inexpensive, was necessary in the manufacture of the alternator, and therefore a very important item to Defendant.

23. When Plaintiff was unable to produce and ship sufficient quantities of acceptable coil brace parts, Defendant became concerned as its ability to manufac-

ture and ship the alternators was interrelated.

24. During 1978 and 1979 several of Defendant's employees John Kossbiel ("Kossbiel"), George Haas ("Haas") and Hal Olson ("Olson"), visited the Plaintiff's manufacturing plant.

25. Plaintiff testified that he required that every plant visitor sign nondisclosure statements prior to being given a plant tour.

26. Plaintiff's nondisclosure statement entitled "Visitor's Entrance Permit" provides in pertinent part:

> In consideration of permission granted to enter plants or other facilities of Reinforced Molding Corporation on _____ (dates) for the purpose of inspecting such plants and facilities, where secret and confidential information belonging to Reinforced Molding Corporation relating to equipment, materials, and processes existing or being used in such plants and other facilities may come to my attention, I agree to maintain all such information in confidence and will not disclose or make any use of such information whatsoever...

27. Each of these three individuals had a different function in the employ of Defendant and a disparate purpose in visiting Plaintiff's plant.

28. Kossbiel was a sales employee or "expediter" of Defendant. It was his function to see that a sufficient quantity of acceptable parts would be shipped.

29. Haas was a "quality control" employee of Defendant. The purpose of his visit was for him to offer advice to the Plaintiff in order to attempt to improve the quality control of the manufacturing of the coil braces.

30. Olson was an "advanced manufacturing concepts engineer" and a "trouble shooter" of Defendant. Even assuming, as Defendant submits, that Olson's original purpose in visiting Plaintiff's plant was to evaluate the pultrusion process and attempt to determine the reasons for the Plaintiff's inability to produce conforming parts consistently, it is clear that during the days he spent observing the manufacturing of the brace parts, he acquired knowledge which later greatly assisted Defendant in subsequently manufacturing the parts themselves.

31. Plaintiff produced as exhibits the visitor permits signed by Kossbiel and Haas. With respect to Olson, however, Sinnott testified that Olson signed the nondisclosure statement, where Olson testified to the contrary.

32. This Court finds it unnecessary to resolve this conflict as Olson acknowledged that the information acquired during these plant visits was confidential.

33. Because Defendant's employees executed nondisclosure agreements, or at least Sinnott thought this to be the case, Sinnott spoke freely about the manufacturing process and materials of coil brace parts. However, he did not "volunteer" information but rather responded to specific questions propounded by Defendant's employees.

34. During the plant visits, the entire manufacturing process was discussed, including components, suppliers of materials, types of fiberglass cloths, resins, catalysts and amounts of materials used as well as heat and time requirements.

35. The day after Olson returned from Plaintiff's plant, specifically on February 15, 1979, he began to work on the manufacture of the brace part. By the end of the summer of 1979 Defendant was able to manufacture the part so as to meet its specifications.

36. Further, by June of 1979, Defendant changed the part to a "make" item from a "buy" item.

37. Clearly, Defendant benefited from observing Plaintiff's process. For instance, Olson testified that he felt the part would have added strength if it had fiberglass cloth reinforcement on the head. In fact, he suggested this to Sinnott who did not accept this "preferred suggestion." It was not mere happen-stance that Defend-

ant's part incorporated this "preferred suggestion."

38. Moreover, had Defendant not carefully inspected and observed the entire manufacturing process of Plaintiff, it would not have been able to duplicate the brace in such a short period of time.

39. Notwithstanding that Defendant made modifications in its own manufacturing process, clearly Defendant benefited from its careful observation of Plaintiff's process.

40. Although it took Plaintiff one year to develop satisfactorily the original part for Defendant, Defendant was able to produce parts to meet its new, more rigid specifications within four months. If nothing else, Plaintiff's research and design were used as a starting point for Defendant's product development.

41. Although modifications were made by the Defendant, including the use of a hand layout mold in lieu of a pultrusion system and variations of the materials, it was the use of Plaintiff's trade secret (the entire manufacturing process) which benefited Defendant in improving Plaintiff's brace part so that it could be made to meet its new strength test requirements.

42. By January of 1980 Defendant completely terminated its purchasing of coil brace parts from the Plaintiff and obtained its supply of parts solely from its in-house manufacture.

43. This Court finds that the Plaintiff possessed a trade secret, *i.e.*, the exact manufacturing process of the brace parts; that Plaintiff disclosed it to Defendant in confidence; that Defendant utilized this trade secret as a starting point in its manufacture of the brace part in breach of that confidence; and that this activity was to Plaintiff's detriment.

44. In 1978 and 1979 Plaintiff sold the brace part to Defendant for an average price of $5.50.

45. Defendant was able to manufacture the brace part in-house at a cost of $4.60. (This figure rejects Defendant's claim that "additional overhead" costs should be add-

ed to the total costs of the part, at a rate of 445% of the labor costs, yielding a price of $11.85. Included in this figure is depreciation of the building, support personnel salaries, and all employees' benefits. The Court disallows this "additional overhead", as part of Defendant's costs, as it is too attenuated and is not directly attributable to the manufacture of this particular part).

46. Therefore, in producing its own parts, Defendant realized a savings of $1.10 per part.

47. In 1979, Defendant utilized 1,824 coil brace parts in its production of electrical alternators.

48. In 1980, Defendant utilized 1,776 coil brace parts for the same purpose.

## CONCLUSIONS OF LAW

1. Trade secret claims brought in federal court are governed by state law. *Rohm and Haas Co. v. Adco Chemical Co.*, 689 F.2d 424 (3d Cir.1982).

2. Pennsylvania law requires that the Plaintiff bear the burden of establishing the basic elements in its trade secret misappropriation claim: that a trade secret exists, that it was communicated to the defendant in confidence, that it was utilized by the Defendant in breach of that confidence, and that the trade secret was utilized to Plaintiff's detriment. *Id.* at 429–430 (citations omitted).

3. Further, in Pennsylvania, the Plaintiff must also prove: that the trade secret is of value to the plaintiff; that it is important to it to conduct its business; and that the plaintiff has a right to the trade secret by virtue of discovery or ownership. *Id.* at 430, citing *Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 213 A.2d 769 (1965).

4. The threshold issue in a claimed trade secret misappropriation case is whether a trade secret in fact exists. *Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 213 A.2d 769 (1965).

5. The Supreme Court of Pennsylvania has defined a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Felmlee v. Lockett*, 466 Pa. 1, 9, 351 A.2d 273, 277 (1976), quoting the Restatement of Torts § 757, comment b (1939) and citing *Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 258–259, 213 A.2d 769, 775 (1965).

6. Further, " 'trade secrets' which will be so protected must be *particular* secrets of the complaining [party] and not general secrets of the trade in which he is engaged." *Id.* (citations omitted) (emphasis in original).

7. Similarly, that which is public knowledge or general knowledge of the industry will not be construed as a trade secret. *Rohm and Haas Co. v. Adco Chemical Co.*, 689 F.2d 424 (3d Cir.1982).

8. In the instant case, the Plaintiff possessed a trade secret, *i.e.*, its manufacturing process for coil brace parts. This process was known only to Plaintiff, which had rights to the process by virtue of discovery. Moreover, up until the time Defendant began to manufacture its own coil brace parts, Plaintiff alone produced these parts. The manufacturing process was not general knowledge of the industry.

9. Further, Plaintiff's trade secret was communicated to the Defendant in confidence and only after Sinnott thought non-disclosure agreements were executed.

10. Subsequently, although the Defendant altered the manufacturing process, at the very least it utilized Plaintiff's process as a starting point to its own manufacture of the coil brace part. This was in breach of the confidentiality understanding between the parties.

11. Defendant's misappropriation of Plaintiff's trade secret was to Plaintiff's detriment.

12. Due to the foregoing, this Court finds that Defendant is liable for the misappropriation of Plaintiff's trade secrets.

13. This Court further finds that the Plaintiff is entitled to damages.

14. With respect to the proper standard for damages for this case, this Court has already held that: " '[t]he appropriate measure of damages, by analogy to patent infringement, is not what the Plaintiff lost, but rather the benefits, profits or advantage gained by Defendant in the use of the trade secret.' " *See* Memorandum Order dated November 17, 1983, quoting *International Industries, Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir.1957) (citations omitted).

15. Damages accrue from the time Defendant began using the trade secret. *Colgate-Palmolive Co. v. Carter Products, Inc.*, 230 F.2d 855, 866 (4th Cir.1956), *cert. den.*, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956), *reh. den.*, 352 U.S. 913, 77 S.Ct. 152, 1 L.Ed.2d 120 (1956).

16. With respect to the accounting period, in accordance with the "headstart" doctrine, an accounting of Defendant's profits is appropriate for the time it saved by the misappropriation. *See, e.g. Engelhard Industries, Inc. v. Research Instrumental Corp.*, 324 F.2d 347, 353 (9th Cir.1963), *cert. den.* 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964). *See also, Schreyer v. Casco Products Corp.* 190 F.2d 921, 924 (2d Cir.1951), *cert. den.*, 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952).

17. Similarly, in *Joseph L. Brooks Mfg. Corp. v. G.S.C. Electronics, Ltd.*, 215 U.S. P.Q. 708, 713 (E.D.Pa.1982), the court held that the appropriate period for damages in a trade secret misappropriation case is the time it would have taken defendant to create the product absent the misappropriation.

18. Therefore, in the instant case, since it took Plaintiff approximately one year to engineer the manufacturing process so that the end product was satisfactory to Defendant, the correct period of time for the Defendant to account for its profits is one year.

19. This period runs from February 15, 1979 (the date that Defendant began to utilize Plaintiff's trade secrets in the manufacturing of its own coil brace parts) to February 15, 1980 (the approximate date by which Defendant would have been able to produce its own coil brace parts without the benefit of Plaintiff's trade secret).

20. Extrapolating from Defendant's figures of the brace parts actually used from February 15, 1979 to December 31, 1979, and utilizing a *per diem* rate of 4.99 parts, Defendant utilized 1596.8 brace parts. Similarly, utilizing Defendant's 1980 figures, and utilizing a *per diem* rate of 4.86 parts, Defendant utilized 218.7 brace parts from January 1, 1980 to February 15, 1980. 1980 figures from January 1, 1980 to February 15, 1980, and utilizing a *per diem* rate of 4.86 parts, Defendant utilized 218.7 brace parts.

21. Therefore, during this one year period, Defendant utilized a total of 1815.5 brace parts. Inasmuch as this Court has determined that Defendant's profit was $1.10 per part, Plaintiff is entitled to $1997.05 in damages.

22. With respect to Plaintiff's claim for cancellation charges, these claims are disallowed as they are not properly recoverable in a trade secret case. In any event, Plaintiff's Complaint does not set forth a claim for breach of contract. Moreover, this Court would note that Plaintiff has already been compensated for Defendant's profit during the period encompassed by its claim of rejected brace parts.

23. Although Plaintiff has also claimed that it is entitled to punitive damages, this request is denied. "Defendant's conduct, while wrongful, has not been shown to be of such an outrageous or egregious nature as would justify an award of punitive damages." *Greenberg v. Croydon Plastics Co., Inc.*, 378 F.Supp. 806, 807 (E.D.Pa.1974), modified on other grounds and otherwise reaffirmed, 184 U.S.P.Q. 27 (E.D.Pa.1974).

In this case, the record does not support a finding of outrageous conduct. To the contrary, this record reflects that Defendant was motivated to manufacture its own brace part because Plaintiff's parts were failing the pull test requirements and the part was needed in the manufacture of the alternators for the large off-road vehicles. Of course, the fact that Defendant had some justification to produce the parts does not negate the finding that in doing so, it misappropriated Plaintiff's trade secret. Rather, it makes a finding of outrageous conduct unwarranted.

An appropriate Order shall issue.