**PARKWAY TOWERS ASSOCIATES**

v.

**Richard H. GODFREY, Jr., in His Capacity as Executive Director of the Rhode Island Housing and Mortgage Finance Corporation.**

**DIAKONIA ASSOCIATES, LIMITED PARTNERSHIP**

v.

**Richard H. GODFREY, Jr., in His Capacity as Executive Director of the Rhode Island Housing and Mortgage Finance Corporation.**

No. 96–39–Appeal.

Supreme Court of Rhode Island.

Feb. 3, 1997.

---

William Mark Russo and Joseph Avanzato, Providence, for Plaintiff.

Peter J. McGinn, Providence, Steven M. Richards, for Defendant.

## OPINION

FLANDERS, Justice.

The plaintiffs, Parkway Towers Associates (Parkway) and Diakonia Associates, Limited Partnership (Diakonia), are developers of government-subsidized housing. They appeal from the Superior Court's entry of a declaratory judgment upholding the validity of certain mortgage-prepayment regulations promulgated by the defendant, the Rhode Island Housing and Mortgage Finance Corporation (RIHMFC), a public entity created to facilitate private investment in residential housing. The regulations govern the prepay-ment of mortgage loans extended by RIHMFC to the plaintiffs. Parkway and Diakonia contend that the trial justice erred in concluding that the regulations were authorized by and consistent with RIHMFC's enabling legislation and other applicable laws. For the reasons set forth below, we affirm the decision of the Superior Court and uphold the validity of the regulations.

### Facts [1]

In June 1977 Parkway and Diakonia executed mortgage notes with RIHMFC pursuant to which they borrowed $3,112,000 and $3,030,000, respectively. These loans were to finance the acquisition, construction, rehabilitation, development, and/or permanent financing of certain government-subsidized, multifamily housing developments in Rhode Island. To secure the loans, Parkway and Diakonia supplied RIHMFC with first mortgages on their housing developments, whereupon RIHMFC financed 90 percent of each development and fixed the interest rate on each mortgage at 6.8 percent. Both mortgages had a repayment term of twenty-five years.

Parkway and Diakonia also entered into regulatory agreements with RIHMFC pursuant to which they agreed to limit the rents that could be charged to low-income tenants and to abide by certain tenant-eligibility criteria at the developments. These agreements were to remain in effect so long as the mortgage notes and mortgages were outstanding.

Parkway and Diakonia were also required by RIHMFC to execute Housing Assistance Payment Contracts (HAP Contracts). Pursuant to 42 U.S.C. § 1437f, the United States Department of Housing and Urban Development advances rental subsidies to RIHMFC, and in turn RIHMFC forwards rental-assistance payments to Parkway and Diakonia. Parkway and Diakonia are then obliged to maintain decent, safe, and sanitary housing at their developments. The subsidies paid by RIHMFC to Parkway and Diakonia equal the difference between the rents prescribed in the HAP Contracts and the actual rent

---

1. The parties submitted an agreed statement of facts to the Superior Court.

paid by lower-income tenants, which is a set percentage of their income. The HAP Contracts initially provided for a five-year term, with the possibility of four additional five-year renewals.

In July 1993 RIHMFC promulgated "Regulations Governing Proposed Prepayments or Transfers" (prepayment regulations). Pursuant to these regulations, a developer who wishes to prepay a mortgage loan must submit a summary of the proposed prepayment and an application to RIHMFC, which then employs certain criteria to determine whether to allow prepayment. By the terms of the prepayment regulations, RIHMFC has final approval of any prepayment application. These regulatory measures are meant to ensure that a developer's prepayment of any mortgage loan does not result in a material escalation in the rents charged at a particular development. In 1993 Parkway and Diakonia became eligible to prepay their mortgages. Upon being informed that they would need RIHMFC approval to prepay, plaintiffs challenged the prepayment regulations by filing separate declaratory-judgment petitions (later consolidated) in the Rhode Island Superior Court.

The Superior Court found that RIHMFC's enactment of the prepayment regulations and its application of these regulations to Parkway and Diakonia were a valid exercise of RIHMFC's statutory powers and that Parkway and Diakonia had the right to prepay their mortgages only upon final approval by RIHMFC. Parkway and Diakonia then appealed the declaratory judgment to this court.

## Analysis

The Rhode Island General Assembly created RIHMFC in response to "a serious shortage of safe and sanitary residential housing and shelter in the state available to persons and families of low and moderate income and the elderly." See G.L.1956 § 42–55–2. The primary purpose of RIHMFC is to "encourage the investment of private capital and stimulate and assist in the construction, rehabilitation, operation, retention, and maintenance of residential housing." Id. To enable RIHMFC to achieve its statutory purposes, the General Assembly granted the corporation "all of the powers necessary and convenient to carry out and effectuate the purposes and provisions of" the Rhode Island Housing and Mortgage Finance Corporation Act. Section 42–55–5. In particular, RIHMFC was authorized to make mortgage loans[2] and to promulgate rules and regulations that would govern the granting of each loan.[3] The most pertinent to this case is a prepayment provision that allows a private developer to prepay RIHMFC loans to maturity "provided the corporation finds that the prepayment of the loan will not result in a material escalation of rents charged to the persons and families of low and moderate income *occupying* the housing development." Section 42–55–9(3) (Emphasis added.) Thus RIHMFC promulgated the prepayment regulations to ensure that any developer seeking to prepay a mortgage loan complied with § 42–55–9(3).

Parkway and Diakonia argue that the regulations are invalid since they require them to maintain affordability restrictions for at least the balance of the original term of the loan irrespective of whether the loan is prepaid. They maintain that the prepayment regulations conflict with the "occupying" language of § 42–55–9(3), contending that the word "occupying" is limited only to those housing occupants in actual possession of a particular housing unit at the time of prepayment. Therefore, they argue, the statutory mandate preventing prepayment from causing a material escalation in rent applies only

---

**2.** General Laws 1956 § 42–55–6(a) provides:

"The corporation shall have all the powers necessary or convenient to carry out and effectuate the purpose and provisions of this chapter, including the following powers in addition to others herein granted: (a) Make, undertake commitments to make, and participate in the making of mortgage loans * * * to housing sponsors * * * to finance the construction or rehabilitation of * * * residential housing designed and planned for occupancy primarily by persons and families of low and moderate income."

**3.** Section 42–55–6(d) grants RIHMFC the power to "[m]ake and publish rules and regulations respecting the grant of mortgage loans pursuant to this chapter."

to current tenants and not to future tenants who may occupy the premises at later times during the original mortgage term. As a result, they claim RIHMFC was prohibited from promulgating regulations that would maintain affordability restrictions for the duration of the mortgage term.

 The prepayment regulations were promulgated by RIHMFC pursuant to specific authority granted to it by the General Assembly. As such, the regulations are legislative rules that carry the force and effect of law and enjoy a presumption of validity. *Lerner v. Gill,* 463 A.2d 1352, 1358 (R.I. 1983). Legislative rules are valid if they are within the power granted by the General Assembly, are issued pursuant to proper procedure, and are reasonable as a matter of due process. *Id.* The prepayment regulations at issue here satisfy all three requirements. They were promulgated according to RIHMFC's authority under § 42–55–6(d); they were issued in a manner consistent with the procedures set forth by the Administrative Procedures Act;[4] and they comport with due process because they are rationally related to RIHMFC's purpose and delineate the criteria applicable to a prepayment request.

This last requirement is of particular importance. The General Assembly, in creating RIHMFC, stressed that the corporation's purpose was not only to assist in the creation of affordable residential housing but also to ensure the *retention* of such housing. *See* § 42–55–2. Therefore, RIHMFC promulgated the prepayment regulations to foster this objective.[5] To allow developers to compromise the future affordability of the housing units by prepayment of the mortgage would undermine this retention-of-affordable-housing raison d'être for which RIHMFC was established and for which the mortgage loans were granted in the first place. *See Lower Main Street Associates v. New Jersey Housing and Mortgage Finance Agency,* 114 N.J. 226, 553 A.2d 798, 801–02 (1989) (recognizing that prepayment regulations are necessary to promote the legislative goals of providing affordable housing for the life of the mortgages). In addition, because Parkway and Diakonia have benefited in numerous ways from their financial dealings with RIHMFC,[6] it is hardly unreasonable for RIHMFC to require the developers to provide such suitable consideration as would be consistent with RIHMFC's objectives before any prepayment of the mortgage loans will be permitted.

 Moreover, we agree with RIHMFC that the term "occupying" in § 42–55–9(3) should be construed to refer to both present and future inhabitants of a residential housing unit during the original mortgage term. Although the statute is not explicit in delineating the exact length of time that should be looked to in making this determination, RIHMFC's administrative interpretation is entitled to great deference, especially when, as here, it is consistent with the overall purposes of the legislation. *See Pawtucket Power Associates Limited Partnership v. City of*

4. General Laws 1956 chapter 35 of title 42. Neither Parkway nor Diakonia has challenged the manner in which the prepayment regulations were adopted; therefore, that issue is not considered.

5. To promote the maintenance of affordable housing for the life of the mortgage loan, the prepayment regulations require a developer to submit financial data to RIHMFC in order for it to assess the developer's ability to sustain a safe and sanitary development in spite of prepayment. In addition, RIHMFC examines the condition of each development and factors the cost of any repairs into the prepayment application. Finally, the prepayment regulations require a developer to enter into a prepayment regulatory agreement with RIHMFC whereby the developer agrees to keep the housing affordable for the remainder of the original mortgage-loan term.

6. For instance, RIHMFC funded 90 percent of the cost of the housing developments, the maturity date on the mortgage loans extends to 2003, and the interest rate on each mortgage loan is fixed at only 6.8 percent. Parkway and Diakonia have been able to take advantage of these better-than-market terms that are part of their mortgage-loan agreement. Under these agreements and pursuant to the prepayment regulations, prepayment of mortgage loans was never an absolute right but always one conditioned on RIHMFC's approval. Thus, we see no reason these developers should not be bound by the rules and regulations properly promulgated by RIHMFC as a condition of prepaying their mortgage obligations.

*Pawtucket*, 622 A.2d 452, 456 (R.I.1993) ("deference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency * * * even when the agency's interpretation is not the only permissible interpretation that could be applied"); *Defenders of Animals, Inc. v. Department of Environmental Management*, 553 A.2d 541, 543 (R.I.1989) ("this court attributes great weight to an agency's construction of a regulatory statute when the statute's provisions are unclear"); *Gallison v. Bristol School Committee*, 493 A.2d 164, 166 (R.I.1985) ("where the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous or unauthorized"). But even if "occupying" referred solely to those tenants who were residing at the development as of the prepayment date, this interpretation would not prevent RIHMFC from including in its regulations other provisions that were designed to keep rents affordable for the entire term of the original mortgage. Thus, the proviso in the last portion of § 42–55–9(3) is not the only statutory condition that has to be satisfied before RIHMFC must permit developers to prepay their RIHMFC loans. Rather, in addition to RIHMFC's being satisfied that prepayment will not result in a material escalation of the rents charged, loans may be prepaid to maturity only "as determined by the rules and regulations of the corporation [RIHMFC]." Section 42–55–9(3). Accordingly, as long as these other rules and regulations establish prepayment conditions that are consonant with RIHMFC's goals and powers, Parkway and Diakonia are bound by the terms of the regulations. In sum, we hold that the prepayment regulations are a valid means to ensure that affordable rental conditions continue at least until the maturity dates of the original mortgage loans.

■ Parkway and Diakonia next argue that the prepayment regulations are invalid because they conflict with The Affordable Housing Preservation Act of 1988, G.L.1956 chapter 45 of title 34 (Affordable Housing Act). They contend that the Affordable Housing Act redefined RIHMFC's role with regard to the issue of prepayment and that as a consequence any rules or regulations promulgated by RIHMFC concerning prepayment are invalid. Again, we disagree.

■ It is well settled that this court effectuates the Legislature's intent "by examining a statute in its entirety and giving the words their plain and ordinary meaning." *In re Falstaff Brewing Corp.*, 637 A.2d 1047, 1049 (R.I.1994). When a statute has a plain, clear, and unambiguous meaning, "the Legislature's intent is gleaned from the plain and literal language contained therein." *Dart Industries, Inc. v. Clark*, 657 A.2d 1062, 1066 (R.I.1995).

With these principles in mind, we conclude that the Affordable Housing Act is plain, clear, and unambiguous and that it does not restrict RIHMFC's power to promulgate the prepayment regulations. The Affordable Housing Act is simply a mechanism by which RIHMFC and tenants who reside in federally assisted or insured housing units are provided certain notice requirements and minimum protection upon prepayment of mortgage loans by developers. *See* §§ 34–45–6, 34–45–11. The Affordable Housing Act neither sets forth any criteria for RIHMFC to follow in granting prepayment applications nor limits in any way RIHMFC's power to promulgate additional rules and regulations governing prepayment.

■ Parkway and Diakonia also maintain that their compliance with the HAP Contracts will prevent the material escalation of rent, thereby satisfying § 42–55–9(3) and rendering prepayment approval by RIHMFC mandatory. But the material-escalation-of-rent provision in § 42–55–9(3) is just one of several regulatory conditions that must be satisfied before prepayment may be allowed. Thus, Parkway and Diakonia may not demand that RIHMFC accept prepayment of the mortgage loans simply upon a showing

that there will be no material escalation in rent for existing tenants. They must also comply with any applicable additional provisions of the prepayment regulations.[7]

██ Finally, Parkway and Diakonia argue that the General Assembly enacted § 42–55–9(9)(d) [8] to address specifically the issue of keeping rental housing affordable after a mortgage loan has been prepaid and that, pursuant to this section, RIHMFC had to provide them with a greater financial return on their investment to bind them to any post-payment affordability restrictions. Once again we disagree.

Pursuant to § 42–55–9(9)(d) Parkway and Diakonia would be entitled to "withdraw a rate of return on redefined equity" only if each agreed to keep the rent affordable (1) for a minimum of twenty years after the date they prepaid their mortgage or elected not to renew a section–8 assistance contract or (2) for a minimum of twenty years after the maturity date of the loan. Parkway and

Diakonia never agreed to these conditions and are therefore not entitled to a greater financial return using a "redefined equity" configuration.

## Conclusion

For the foregoing reasons we deny the consolidated appeal of Parkway and Diakonia, affirm the declaratory judgment of the Superior Court to the extent noted above, and remand the papers of this case to the Superior Court.

---

7. Parkway and Diakonia also argue that compliance with the HAP Contracts would prevent any material escalation of rents to low-income tenants after prepayment of the mortgage loans. However, an examination of the HAP Contracts reveals the possibility of a contrary result. Pursuant to § 1.8 of the HAP Contracts, Parkway and Diakonia are required to maintain decent, sanitary, and safe housing at their developments. Should these conditions be breached, either voluntarily or involuntarily, RIHMFC would be entitled to terminate the HAP Contracts pursuant to § 2.8. Parkway and Diakonia would then be relieved of all duties and restrictions under the contracts, including the affordability restrictions, and would be able to raise the rents. Therefore, the HAP Contracts fail to safeguard adequately against a possible material escalation of rent upon or after prepayment—even for those tenants occupying the premises at the time of the prepayment.

8. Section 42–55–9(9)(d) provides:
 "A housing sponsor may not make distributions of income or earnings from a housing development or housing project financed by the corporation in any one year in excess of six percent (6%) (or such higher or lower percent as shall be prescribed by rules and regulations of the corporation) of the housing sponsor's equity in the development nor shall any of the principals or stockholders of the housing sponsor at any time earn, accept or receive a return greater than six percent (6%) per annum (or such higher or lower percent as shall be prescribed by rules and regulations of the corporation) of his or her investment in any housing development financed by the corporation. The sponsor's equity in a housing development shall consist of the difference between the corporation assisted mortgage loan and the total housing development cost. With respect to every housing development assisted by the provisions of the chapter *the corporation shall,* pursuant to regulations adopted by it, *establish the sponsor's equity at the time of the making of the final mortgage advance and, for purposes of this subdivision, that figure shall remain constant during the life of the corporation's mortgage on the development;*
 *"Notwithstanding the above, the corporation shall allow existing project owners to withdraw a rate of return on redefined equity provided* the corporation finds that the project is 'stable and financially secure'. * * * In addition, *the following requirements must occur: * * * (ix) [t]he owner agrees to maintain the housing affordable to persons of low and moderate income for (a) a minimum of twenty (20) years from the date that owner could prepay a mortgage securing a development,* as that term is defined in § 34–45–4, *or could elect not to renew a section 8 assistance contract* under § 34–45–5 *or (b) twenty (20) years from the maturity date of a note evidencing indebtedness to the corporation* which is secured by a housing development." (Emphases added.)