**R.P.E. DISPOSAL, INC.**

v.

**Elizabeth A. MOWCHAN et al.**

No. 95–487–Appeal.

Supreme Court of Rhode Island.

May 20, 1997.

Kelly M. Fracassa, Westerly, for Plaintiff.

Howard C. Sweet, Jr., Ashaway, Michael DeSisto, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG and FLANDERS, JJ.

## OPINION

PER CURIAM.

This case calls into question a municipality's attempt to allocate fairly its below-market, municipal-trash disposal rate among the licensed refuse haulers in its community. It came before us pursuant to an order that directed the town of Richmond (the town) and various defendant town officials[1] to appear and show cause why the issues raised by this appeal should not be summarily decided. After considering the arguments of counsel and reviewing their memoranda, we perceive no cause and therefore proceed to determine the merits of the appeal at this time.

---

1. These include defendants Elizabeth A. Mowchan, Henry R. Oppenheimer, Jeffrey R. Gross, Ralph J. Murphy, and Carolyn S. Richard personally and in their capacities as members of the Town Council of the Town of Richmond and Brian Stanley in his capacity as treasurer of the town of Richmond.

In 1987 the town entered into a contract with M.J. Murphy, Inc. (Murphy), a licensed refuse hauler, whereby Murphy agreed to "establish and operate" a refuse-transfer station in the town. For a fee, town residents, as well as other licensed refuse haulers, can deposit trash at the station.[2] After processing this waste, Murphy transports the refuse to the state landfill for final disposal. As part of the consideration to be paid to Murphy for building and operating the transfer station, the town assigned Murphy all its allocated waste tonnage eligible to be disposed of at the state landfill at the below-market municipal rate.[3]

In 1992 plaintiff, R.P.E. Disposal, Inc. (R.P.E.), also a licensed refuse hauler, sought an allocation from the town of its municipal rate, pursuant to G.L.1956 § 23–18.9–1(b)(3).[4] The town denied the request because, as part of its contract with Murphy to build and operate the transfer station, it had already promised Murphy its entire allocated waste tonnage at the municipal rate. R.P.E. then filed a declaratory-judgment action in Superior Court, seeking to declare the town in violation of § 23–18.9–1(b)(3). Although R.P.E. obtained a summary judgment, the town still failed to enact the rules and regulations required by the statute. Consequently R.P.E. filed this action to compel the town to adopt the appropriate "fair allocation" regulation. In March 1994, during the pendency of this suit, the town enacted "Rules and Regulations for the Fair Allocation of the Municipal Rate Provided Under the Provisions of R.I.G.L.1956 (1989 Reenactment) § 23–19–13(g)." In pertinent part, these rules and regulations provide as follows:

"[Section] 3.2 Every contract between the Town of Richmond and any licensed hauler eligible to collect and haul refuse within the Town of Richmond shall be honored by the Town to the extent of said contract hauler's actual average usage of the allocated rate over the preceding three (3) fiscal years. In addition, said contract haulers shall be further protected by allocating to them an additional five (5%) percent of the actual average usage for the fiscal year next following upon said hauler's request for said allocation.

"[Section] 3.3 Any balance of the Town rate over and above the cumulative actual average previously awarded by contract, together with an additional five (5%) percent, if any, shall be available for award to those licensed haulers who shall apply to the Town Clerk for a share of said balance."

Construing these new regulations as merely a codification of the pre-existing Richmond–Murphy contract, R.P.E. filed a supplemental complaint, seeking *inter alia* a declaratory judgment and a writ of mandamus ordering the town to enact new rules and regulations that would fairly allocate the municipal rate. R.P.E. also sought money damages to offset the difference between the rate it currently paid to the state landfill and the rate it would pay had it shared in the town's municipal rate, as well as money damages pursuant to 42 U.S.C. § 1983. The Superior Court denied R.P.E.'s summary-judgment motion with respect to the money-damages counts. However, the court granted the motion with respect to the declarato-

---

2. Unlike some larger cities, the town does not maintain a publicly funded waste-collection program. Rather, municipal-waste collection is provided by private contracts between the generator of the waste and a licensed refuse hauler.

3. The municipal rate is the below-market tipping fee charged to municipalities by the Rhode Island Resource Recovery Corporation (formerly the Rhode Island Solid Waste Management Corporation) (the corporation). For each city and town, the corporation fixes an annual maximum amount of refuse that may be disposed of at the state landfill at this municipal rate. *See* G.L. 1956 § 23–19–13(g)(3). Historically, the municipal rate has been less than the rate charged by

the corporation to commercial refuse haulers and other landfill users.

4. General Laws 1956 § 23–18.9–1(a)(1) mandates that each city and town provide "for the safe and sanitary disposal of all refuse which is generated within its boundaries * * *." Pursuant to § 23–18.9–1(b)(3), cities and towns like Richmond, "where municipal waste collection is provided by private contract between the generator of the waste and the hauler," are empowered to discharge this duty by "adopting rules and regulations for the fair allocation of the municipal rate provided under the provisions of § 23–19–13(g) among those haulers licensed to collect and haul refuse within the cities and towns."

ry-judgment count and issued the requested writ. In concluding that the rules and regulations adopted by the town had failed to comport with the provisions of § 23–18.9–1, the motion justice stated:

> "Because Murphy's contract is the only one in existence, there is no way this provision [section 3.2] could yield the fair allocation to which other licensed haulers would be entitled. The combined effect of the town's contract with Murphy and the regulations it promulgated is to deprive other licensed haulers such as [R.P.E.] from their statutorily-mandated allocation."

The motion justice then ordered the town to enact new rules and regulations. Instead the town appealed to this court. We now reverse.

The determinative issue before us is one of statutory interpretation: how should the term "fair allocation" in § 23–18.9–1(b)(3) be construed as it relates to the distribution of the municipal rate in the town among the various haulers who are potentially eligible to take advantage of this lower rate? Advancing essentially two arguments, the town contends that the rules and regulations it promulgated provide for a fair allocation of the municipal rate and satisfy the requirements of § 23–18.9–1(b)(3). First, the town argues that the preferential treatment afforded Murphy in the town's refuse regulations should be considered a fair allocation of the municipal rate because Murphy, as a quid pro quo for its priority status, has and continues to provide the town with a uniquely valuable refuse-removal service: namely, its construction, operation, and maintenance of a transfer station. Accordingly, the town contends it is fair for its allocation of the municipal rate to reflect Murphy's unique contribution to the town's refuse removal. Second,

the town maintains that the allocation scheme contemplated by the rules and regulations is not unfair as applied to R.P.E. because such an allocation will as a factual matter result in R.P.E.'s obtaining the lower municipal rate on *all* the refuse it currently deposits at the state landfill.[5]

Nonetheless, R.P.E. labels the current allocation scheme "unfair" because it "favor[s] one hauler [Murphy] at the expense of all others." In particular R.P.E. argues that a future increase in Murphy's usage, coupled with applications from other licensed haulers, will exclude smaller haulers like R.P.E. from sharing in the municipal rate while Murphy would remain shielded from any diminution in its allocation because its contract with the town always gives it priority in obtaining use of the town's municipal rate. However, because of the economic value of the transfer-station service provided by Murphy to the town, it may not be unfair as a matter of fact or policy for the town to put Murphy on a preferred footing vis-à-vis the allocation of its municipal rate. Moreover, the mere possibility that Murphy's future allocations may grow to eclipse any possible future allocations to R.P.E. is too speculative a basis on which to grant a summary-judgment motion striking down the regulation as unfair on its face as a matter of law.

In any case, as the record now stands, we disagree with the motion justice's conclusion that as a matter of law the rules and regulations promulgated by the town fail to comply with the fair-allocation mandate of § 23–18.9–1(b)(3). Rather it is our opinion that the determination of whether the municipal rate for the town is fairly allocated is a mixed question of law and fact that can be decided only if there are no genuine issues of material fact. Here, however, viewed in the light

---

5. The town submits that by law it is currently entitled to dispose up to 2,606 tons of refuse annually at the state landfill at the lower municipal rate. It contends that Murphy uses approximately 50 percent of that figure each year and R.P.E. approximately 14 percent. If the town's figures are correct, then if R.P.E. had reapplied for its share of the municipal rate after the town's promulgation of the rules and regulations, it would have received the lower rate for the entire amount of refuse it disposed of at the landfill during the course of the most recent

fiscal year. At oral argument R.P.E. stated that the 14–percent figure was for one fiscal year only, and it argued that the town's position failed to account for the likelihood of future applicants and future increases in Murphy's disposal tonnage. But the important point at this summary-judgment stage is that at least as it is currently applied, the regulation does not appear to have any adverse economic consequences for R.P.E., let alone any unfair consequences, and whether it will do so in the future remains a speculative matter at this time.

most favorable to the town, the regulation may not be unfair to R.P.E. as the factual record now stands. *See Benner v. J.H. Lynch & Sons, Inc.*, 641 A.2d 332, 335 (R.I. 1994) (after reviewing the "appropriate evidence in the light most favorable to the nonmoving party * * * if any genuine issue of material fact to be resolved by the factfinder exists, the case is inappropriate for summary judgment").

We reach this conclusion by examining the relevant statutory chapter in its entirety. We also accept the interpretation "most consistent with the statute's policies or obvious purposes." *Bailey v. American Stores, Inc./ Star Market*, 610 A.2d 117, 119 (R.I.1992).

 A review of G.L.1956 chapter 18.9 of title 23 leads us to conclude that cities and towns, in their attempts to satisfy the statutory goal of "safe and sanitary disposal of all refuse," have been afforded considerable latitude in adopting rules and regulations for the fair allocation of the municipal rate under § 23–18.9–1(b)(3). Nothing in the language of the chapter seeks to narrow the range or the type of allocation arrangements among licensed haulers that can constitute a fair allocation. Moreover, the statute also grants cities and towns wide discretionary rule-making power in other matters pertaining to the licensing of refuse haulers and the separation of recyclable materials. *See, e.g.,* § 23–18.9–1(b)(1) and (4). We believe that the broad authority conferred by the General Assembly upon cities and towns in this area reflects a policy determination that local communities are best positioned to decide how to allocate their municipal rate fairly to accomplish the "safe and sanitary disposal of all refuse" within the town according to the particular circumstances, needs, and resources peculiar to each municipality.

 Thus, a fair allocation of the municipal rate in the town is one that the town council reasonably believes will best achieve the "safe and sanitary disposal of all refuse" within the town's borders. Given the apparently unique benefit conferred by Murphy upon the town through its construction, operation, and maintenance of the town's only refuse-transfer station, the town has decided that the goal of safe and sanitary refuse disposal in its community can be fairly achieved by honoring the bargain struck in its existing contract with Murphy and by the preference given to such a contract in the rules and regulations allocating the town's municipal disposal rate. Absent evidence that such a determination is unfair as applied, it should be accorded the same presumption of legality that similar enactments enjoy. *E.g., Verdecchia v. Johnston Town Council,* 589 A.2d 830, 832 (R.I.1991) (the "exercise of a legislative function by a town council * * * enjoys a presumption of legality"); *see also Parkway Towers Associates v. Godfrey,* 688 A.2d 1289, 1293 (R.I.1997) ("regulations * * * promulgated * * * pursuant to specific authority granted * * * by the General Assembly * * * are legislative rules that carry the force and effect of law and enjoy a presumption of validity"). In any event, because the alleged unfairness of such a determination as applied to R.P.E. involves genuine issues of material fact, it should not have been resolved on summary judgment.

For the foregoing reasons the appeal is sustained, the judgment appealed from is vacated, and the papers of this case may be remanded to the Superior Court for further proceedings consistent with our opinion.

BOURCIER, J., did not participate.