This matter was heard by the Court sitting without a jury in May and June of 1997. At the conclusion of the trial, judgment was reserved and the parties agreed to submit post-trial briefs.
After amending the initial complaint, plaintiffs, Read and Lundy, Inc. (RL) and Clifford McFarland (McFarland), brought five tort claims against the defendants, Michael Brier (Brier), Michael Brier Company (Brier Co.), and Consigned Systems, Inc., (CSI). These claims are as follows: (1) Misappropriation of Trade Secrets, asserted against Brier, Brier Co., CSI; (2) Tortious Interference With Contractual Relationship, asserted against Brier CSI; (3) Interference With Prospective Business Advantage, asserted against Brier CSI; (4) Breach of Professional Duty, asserted against Brier, and Brier Co.; and (5) Trade Disparagement asserted against Brier CSI. The defendants filed a counterclaim which was dismissed as a matter of law, as was plaintiffs' trade disparagement claim.
 Travel/Facts
RL is an industrial supplier. It sells hardware items to industrial concerns, manufacturing facilities, and the boat building industry. A distinctive feature of RL's operations is that it uses the consigned inventory system with several of its major customers. Thus, instead of carrying its own inventory and having to employ personnel to oversee this inventory, the system enables a customer to stock RL's inventory in its plant on a consigned basis. RL replaces the inventory as necessary, and bills the customer on a monthly basis for items used. This relieves the customer of the burden of running its own inventory system and, as a result, makes the customer very dependent on RL for the supply of the same items.
In 1990 McFarland, sole stockholder in RL, and Dennis Bibeau (Bibeau), an employee of RL, executed a Stock Purchase Agreement (1990 Agreement), whereby Bibeau agreed to purchase McFarland's stock in RL. Amended Complaint, p. 2. As part of the 1990Agreement, both parties contracted not to compete with RL for a term of three years after terminating employment with the Company. 1990 Agreement, p. 15. In early 1995, McFarland declared a default under the 1990 Agreement. McFarland Bibeau subsequently executed an Amended and Restated Stock Purchase Agreement (1995 Agreement) in August of 1995. Amended Complaint, p. 2. The 1995 Agreement reads in pertinent part:
 "If an Event of Default shall occur and be continuing, Seller elects to exercise his rights and remedies hereunder and Buyer's Employment Agreement with Corporate Guarantor is terminated, then Buyer agrees and covenants that Buyer shall not, without prior written consent of Seller, directly or indirectly, anywhere within the Territory for a period from the date of Seller's Employment Agreement until three (3) years following the said date: (i) form, acquire or become associated in any capacity or to any extent with an enterprise competitive with the business of Corporate Guarantor with respect to the products sold by Corporate Guarantor to its clients, customers or accounts existing as of said termination date; or (ii) for the purpose of conducting or engaging in any business which is competitive or engaging in any business which is competitive with the business of Corporate Guarantor, call upon, solicit, advise or otherwise do, or attempt to do, business with any clients, customers or accounts existing as of said termination date."
 Amended and Restated Stock Purchase Agreement, 1995, Paragraph 15.2.
In approximately 1993, Brier formed Brier Company. In 1994, Bibeau contacted Brier to assist in the securing of financing for the buyout of contractual obligations that Bibeau and RL had with McFarland. Deposition of Michael Brier, January 16, 1996, p. 88. Brier acted as accountant for RL (Affidavit of MichaelBrier, Plaintiffs' Exhibit No. 45), Brier Co., rendered bills to RL (Plaintiffs' Exhibit No. 40), and those bills were paid by check by RL (Plaintiffs' Exhibit No. 41). As RL's accountant, Brier had access to the company's records, including financial records, customer lists, supplier information and customers' billing histories. Brier subsequently prepared a business plan for RL which was submitted to Robert McCormick of First Bank and Trust.
After Bibeau failed to make the initial payment under the 1995 Agreement, McFarland declared a default and took back the stock and control of RL. Amended Complaint, p. 3. Bibeau left his employment with RL as of September 15, 1995. Id. The following week, Bibeau approached Brier and asked Brier for advice about setting up a competing corporation. Deposition ofMichael Brier, November 21, 1996, p. 155. During the course of several conversations, Brier Bibeau discussed Bibeau's financial situation and his legal status as far as the existence of the non-compete agreement was concerned; whether Bibeau could convince RL customers to switch their purchases to a new corporation; how the corporation would be set up; and who would work for the corporation. Id. p. 156-158.
On or about September 21, 1995, Brier Bibeau met with William and Susan Day for the purpose of soliciting William Day from RL in order to work for CSI. Susan Day, it must be noted, was a most credible and persuasive witness. In her affidavit Ms. Day stated:
 "Mr. Brier stated that `Mr. Bibeau is not here' at the meeting because it would be a breach of his covenant not to compete. Mr. Bibeau stated that Mr. Brier owns Consigned Systems, Inc. Mr. Bibeau, based on his noncompetition covenant, could not own a business that competed with RL. I also asked Mr. Bibeau if he had the computer programs and other customer information from RL so that he could compete with RL for their customers. Mr. Bibeau stated that I should not be concerned because he had copies of all computer programs of RL and the customer information necessary to compete with RL."
The following day, September 22, 1995, Brier incorporated CSI, Brier being listed as the sole director of the corporation. (Articles of Incorporation, Plaintiff's Exhibit No. 85.) Bibeau was hired as a special consultant to CSI. Bibeau testified that he reasonably believed that the non-compete clause contained in the 1995 Agreement was unenforceable because he did not receive consideration of an employment contract with RL. Thereafter, Bibeau contacted RL customers, namely Tillotson Pearson, Inc. (T.P.I.), Alden Yachts, Globe Manufacturing, Inc., PY Small Boats and Black Watch, to solicit their business. As a result of bids submitted by CSI to RL customers, plaintiffs allege that RL lost at least one customer, PY Small Boats, and had to reduce its prices to a number of other customers. McFarland testified that before CSI was formed, RL had a profit margin of 40 percent. McFarland further testified that RL had intended to reduce this margin to 35 percent, but that as a result of CSI submitting bids to RL's customers, RL was, in fact, forced to reduce its margin to 30 percent.
As part of obtaining financing for CSI, Brier submitted a business plan to Robert McCormick of First Bank and Trust.Plaintiffs' Exhibit No. 2. In the business plan, Brier referred to Bibeau as "Vice President in charge of marketing," and stated that Bibeau "brings an extensive customer loyalty with him to CSI." Id. p. 2. Brier acknowledged in the plan that:
 "the critical issue to be dealt with is a non-compete agreement that might have been agreed to by one of the principals, Dennis Bibeau. We have been assured by Dennis' legal representative that there was no enforceable contract. However, in order to head off a potential problem, Dennis has filed suit in court to hear that matter and rule on a potential conflict." Id. p. 10.
Later in the same business plan, Brier stated that "[a]ll financial information is based on former projections calculated for a competitor who was approved for an S.B.A. loan." Id. p. 11.
In the ensuing lawsuit between Bibeau and RL and McFarland, Judge Lagueux of the Rhode Island Federal District Court found Paragraph 15.2 of the 1995 Agreement, the buyer's noncompetition clause, to be a valid clause as between Bibeau McFarland. Readand Lundy Inc. v. Dennis Bibeau, Case No. 95-512L; Dennis Bibeauv. Read Lundy, Inc., Clifford McFarland, Jr., Case No. 95-538 (Consolidated Bench Decision) (D.R.I. 1996, p. 15). In addition, Judge Lagueux determined that Bibeau had appropriated and used the RL computer program with all the information about RL's customers in violation of the RI Trade Secrets Act. Id. at 18. As a result of violating the non-compete agreement, the Court issued a three year injunction against Bibeau not to compete with RL customers who were customers at the time Bibeau left RL. For violating the Trade Secrets Act, Bibeau was permanently enjoined from using the information he had taken from RL. Id. at 25-27.
On May 9, 1996, in the instant matter, Justice Israel, of the Rhode Island Superior Court, heard the plaintiffs' motion for a preliminary injunction to prevent the defendants from using or disclosing the plaintiffs' confidential business information in order to compete with the plaintiffs in the consigned inventory business. Justice Israel found that Brier, as its accountant, was privy to RL's confidential business information such as RL's customer lists, accounts receivable, sales records, costs, pricing, inventories, suppliers and the profitability of its product; that customer information, such as credit history, sales volume, prospective future business, service relationships, special needs of customers, supplier lists, cost information, pricing policies and profitability are trade secrets as defined in R.I.G.L. 1956 § 6-41-1(D); that he conspired with Dennis Bibeau to use that confidential information in order to compete advantageously with RL; that he disclosed such information to CSI; and that he intentionally interfered with Bibeau's non-compete agreement with RL. The Court enjoined the defendants for a period of one year, effective May 9, 1996, from soliciting business from any customer with whom RL did business, so far as that business activity is shown in any business record in the possession of Brier. The Court determined that the ability of the defendants to use any confidential information that they wrongfully obtained will be totally attenuated within that one year period.
1. Misappropriation of Trade Secrets
The plaintiffs allege that the defendants, Brier, CSI and Brier Co., used trade secrets which Brier and Bibeau had improperly acquired from RL. The plaintiffs state that these trade secrets include RL's information concerning the following: customer lists; identities of purchasing managers; customer credit histories; special discounts; cost and selling prices; sales histories; specialty items; product lists; sourcing of products; and promotional material. Plaintiffs seek compensatory and punitive damages, and seek imposition of a permanent injunction against Brier and CSI from competing with RL.
In response, the defendants state that the "trade secrets" alleged by the plaintiffs are, in fact, generally known within the industrial distribution industry and are readily ascertainable by proper means.
The Uniform Trade Secrets Act states that ""[i]mproper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy. . . ." R.I.G.L. 1956 § 6-41-1(A). The Act defines misappropriation as:
 "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
 (2) Disclosure or use of a trade secret of another without the express or implied consent by a person who:
 (a) Used improper means to acquire knowledge of a trade secret;
 or
 (b) At the time of disclosure or use, knew or had reason to know that his or her knowledge of a trade secret was:
 (i) Derived from or through a person who had utilized improper means to acquire it;
 (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
 (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; . . . ."
 R.I.G.L. § 6-41-1(B).
Section 6-41-1(D) defines a trade secret as:
 ". . . information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
 (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
 (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. . . ."
The threshold question is whether there was a trade secret at all. Greenberg v. Croydon Plastics Co., Inc., 378 F. Supp. 806, 812 (E.D. Pa. 1974). Former employees have a right to take with them the skill they acquire, the knowledge they obtain, and the information they receive, but not the property of their former employer. Salsbury Laboratories, Inc., v. Merieux Laboratories,Inc., 908 F.2d 706, 713 (11th Cir. 1990). The owner of a trade secret, however, must take reasonable precautions to protect its secrecy. Greenberg, 378 F. Supp. at 812. Only reasonable efforts, not all conceivable efforts, are required to protect the confidentiality of putative trade secrets. Surgidev Corporationv. Eye Technology, Inc., 828 F.2d 452, 454 (8th Cir. 1987).
Where information concerning a list of customers is confidential in nature and, therefore, partakes of the character of a trade secret, a former employer is entitled to equitable relief to protect that information against use by a former employee after termination of his employment. Callahan v. RhodeIsland Oil Co., 103 R.I. 656, 660, 240 A.2d 411, 413 (1968). But, "where the identity of customers is readily ascertainable through ordinary business channels or through classified business or trade directories, the courts refuse to accord to the list the protection of a trade secret." Callahan, 103 R.I. at 661, 240 A.2d at 413-414. Even if the names of a plaintiff's customers appear in a public directory, however, those names may appear among the names of many other businesses which may be neither actual nor even potential customers of the plaintiff.Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1332 (9th Cir. 1980). A list of people who have already purchased a product is substantially more valuable than a list of people who only might be interested in purchasing the product. Id. Such a showing, together with other facts, might justify an inference that the names of plaintiff's actual customers are protectible trade secrets. Id. A finding of confidentiality may be proper, even if the customer's names are well known, if the special characteristics are important to the seller and not obvious. Id.See also, Sethscot Collection, Inc., v. Drbul, 669 So.2d 1076, 1078 (Fla. App. 1996)(distinguishing a list of potential customers, which is readily ascertainable from other sources and thus, not protectible, from an active customer list with a purchasing history, which is protectible).
Misappropriation and misuse can rarely be proved by convincing and direct evidence. Greenberg, 378 F. Supp. at 814. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him [or her] that it is more probable than not what plaintiffs allege happened did in fact take place. Id. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything. Id.
In the instant matter, this Court finds that customer information concerning credit history, sales volume, prospective future business, service relationships, special needs of customers, supplier lists, cost information, pricing policies, and profitability are trade secrets as defined by §6-41-1(D). Although, as the defendant argues, the names of the individual customers of RL might be readily ascertainable from other sources, here it is clear that CSI had more than a mere list in its possession. There is an abundance of evidence which demonstrates that CSI used customer and stock lists which are identical to those of RL. Although these are not, of themselves, trade secrets, they are compelling circumstantial evidence that CSI misappropriated RL's trade secret information with regard to its cost and pricing of these items.
The defendants' argument, that RL made no effort to maintain the secrecy of said information, is without merit. The evidence indicates that it was Bibeau who hired Brier on RL's behalf and gave Brier access to confidential information, and that it was Bibeau, as RL's president, who was the individual in charge of developing and implementing a security system. It is disingenuous for the defendants to argue, as they do now, that these security measures were insufficient protection from the misappropriation of RL's trade secrets by individuals, such as Brier and Bibeau, who had unlimited access to same.
A discussion of damages will follow later.
2. Tortious Interference with Contractual Relationship
The plaintiffs allege that Brier knew, or should have known, that Bibeau was contractually obligated not to compete with McFarland and RL under the Stock Purchase Agreements. The plaintiffs further allege that, by willfully and maliciously inducing Bibeau to breach his obligation not to compete, Brier 
CSI tortuously interfered with this contractual relationship, damaging McFarland as a result. Plaintiffs seek compensatory and punitive damages.
Alternatively, the defendants contend that it was Bibeau, not Brier, who formulated the idea to establish CSI and that at that time, Bibeau reasonably believed that his non-compete agreement was unenforceable, as evidenced by his filing for a declaratory judgment against the non-compete agreement on the advice of counsel. In addition, the defendants state that because the Federal District Court did not preclude Bibeau from working for CSI when it found the 1995 Agreement to be enforceable only as to RL customers as of September 15, 1995, his employment by CSI does not constitute a breach of the non-compete agreement.
"The basic elements of a claim based on a tortious interference with a contractual relationship are:
 `(1) the existence of a contract;
 (2) the alleged wrongdoer's knowledge of the contract;
 (3) his intentional interference; and
 (4) damages resulting therefrom.'"
Jolicoeur Furniture Co., Inc. v. Baldelli, 653 A.2d 740, 752 (R.I. 1995) (citing Smith Development Corporation v. BilowEnterprises, Inc., 112 R.I. 203, 211, 308 A.2d 477, 482 (1973)). The interference need not result in a breach for the defendant's conduct to be tortious New England Multi-Unit Housing LaundryAssociation v. Rhode Island Housing Mortgage FinanceCorporation, 893 F. Supp. 1180, 1192 (D.R.I. 1995). Tort liability may be imposed upon a defendant who intentionally and improperly interferes with a plaintiff's rights under a contract with another person if the interference causes the plaintiff to lose a right under the contract or makes the contract rights more costly or less valuable. Jolicoeur Furniture Co., Inc., 653 A.2d at 752. In maintaining the cause of action, malice, in the sense of spite or ill will, is not required; rather legal malice and intent to do harm without justification will suffice. Id. at 753. The burden of proving sufficient justification for interference is upon the defendant. Smith, 112 R.I. at 211, 308 A.2d at 482.
Applying the Smith test, it is clear that Bibeau McFarland were parties to two stock Purchase Agreements which both contained non-compete clauses. Therefore, the first element of the Smith test is satisfied. The evidence shows that Brier was aware of the existence of the non-compete agreement and was concerned about its potential ramifications. Brier stated that Bibeau approached him with idea of forming a new corporation to compete with RL, that they discussed Bibeau's non-compete agreement, and that Bibeau believed that the contract was not valid. Before actually forming the corporation, Brier Bibeau met with Michael Susan Day. At that meeting, Brier announced to the Days that Bibeau was not present when in fact Bibeau was in the room for all to see. When asked for a reason for such a pronouncement, Brier alluded to a non-compete agreement.
Such behavior raises serious doubts as to Brier's assertion that he believed the contract to be invalid. In fact, the very next day after the meeting, Brier formed the very corporation which he asserts was Bibeau's idea, with himself as the sole stockholder and director, and Bibeau as a "special consultant." It strains credibility to believe that Bibeau would have brought his idea and expertise to Brier in return for no part of the corporation. It is clear from the evidence that Brier went to great trouble to give the appearance that Bibeau was uninvolved in the formation and running of CSI despite the fact that Bibeau was actively involved in CSI's operations. Such conduct demonstrates that Brier was fully aware of the non-compete agreement and demonstrates that despite this awareness he, nevertheless, completely disregarded and intentionally interfered with the agreement. Thus, the defendants have failed to meet their burden of proving sufficient justification for the interference. As McFarland alleges that the value of his stock in RL decreased as a result of the tortious interference by Brier and CSI with the mutual non-compete agreement, he seeks compensation for this loss.
A discussion of damages will again follow later.
3. Interference With Prospective Business Advantage
The plaintiffs allege that Brier and CSI interfered with RL's prospective business advantage when they solicited business from RL's long-standing customers. Specifically, they allege that the defendants caused PY Small Boats to terminate its contract with RL, and that defendants' attempted solicitation of RL's other major customers forced RL to reduce its prices in order to maintain those existing business relationships. The plaintiffs seek compensatory and punitive damages, and ask this Court to permanently enjoin Brier and CSI from competing with RL. The defendants argue that neither CSI nor Brier was under any obligation not to compete with RL and that plaintiffs have not shown any evidence of interference or damages.
Rhode Island recognizes a cause of action for interference with prospective business advantage. Our Supreme Court has stated that:
 "[o]ne who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to the other for the pecuniary harm resulting from the loss of the benefits of the relation, whether the interference consists of
 (a) inducing or otherwise causing a third person not to enter or continue the prospective relation, or
 (b) preventing the other from acquiring or continuing the prospective relation." Mesollella v. City of Providence, 508 A.2d 661, 669 (R.I. 1986).
The elements of such a claim are:
 "(1) the existence of a business relationship or expectancy;
 (2) knowledge by the interferor of the relationship or expectancy;
 (3) an intentional act of interference;
 (4) proof that the interference caused the harm sustained; and
 (5) damages to the plaintiff." Id.
The plaintiff must prove that the defendant acted with legal malice, that is the intent to do harm without justification. NewEngland Multi-Housing Laundry Association v. Rhode Island HousingAnd Mortgage Finance Corporation, 893 F. Supp. 1180, 1193 (D.R.I. 1995). The burden then falls upon the defendant to demonstrate a justification for its actions. Id.
The elements of interference with prospective business advantage are identical to those required to state a claim based on tortious interference with contractual relations, excepting the latter's requirement that an actual contract exist.Mesollella, 508 A.2d at 670. Thus, the plaintiff need not prove the existence of a valid contract, but it must demonstrate the reasonable expectancy of entering into a valid business relationship. E.J. McKernan Company v. Gregory, 623 N.E.2d 981, 995 (Ill. App. 2 Dist. 1993). In E.J. McKernan, the Illinois Court of Appeals acknowledged that while a former officer may solicit a business' employees and apply personal knowledge and experience gained from plaintiff employer, a jury may impose liability when the officer uses confidential information by improper means to interfere with the business relations established between the company and its customers and employees.Id, at 996. Absent a valid contract between the plaintiff and a customer, solicitation by an employee of his former employer's customers will not be enjoined unless some type of unfair trade practice is shown, such as where trade secrets and confidential information is used in the solicitation. Hollingsworth SolderlessTerminal, Co., v. Turley, 622 F.2d 1324, 1337 (9th Cir 1980). To prohibit a company from soliciting the customers of a competitor, even a competitor's long-standing customers, where such solicitation does not otherwise constitute an unfair practice, would be inconsistent with the balance between stability of contractual business relationships and encouragement of competition. Id.
In the instant matter, the plaintiffs have presented a considerable amount of evidence demonstrating RL's business relationships in the form of long-standing consignment inventory systems with TPI, Alden Yachts, Globe Manufacturing and PY Small Boats. The plaintiffs have also demonstrated that Brier and CSI were aware of these business expectancies through Brier's employment with RL, and that CSI, through Brier, misappropriated trade secrets and confidential information from RL and used this information to solicit long-standing customers of RL. The plaintiffs have shown that as a result of these actions, RL has lost profits. The defendants have not offered a persuasive justification for their actions.
4. Breach of Professional Duty
The plaintiffs further allege that Brier and Brier Co., breached their professional duty in violation of Section5-3.1-23(a) of the Public Accountancy Act, when Brier, via CSI, used information he had obtained from working for RL. Specifically, the plaintiffs allege that Brier used confidential computer records and business information to obtain financing for, and to operate, CSI; violated his fiduciary duty; and knew of, interfered with, and subsequently attempted to conceal his interference with the non-compete agreement. Plaintiffs allege that Brier Co., is liable on a theory of respondeat superior. Plaintiffs seek compensatory and punitive damages, as well as a permanent injunction against further use or disclosure of RL's confidential information.
The defendants deny that they ever supplied any information to anyone and state that there is no evidence to the contrary. Furthermore, they allege that they were hired only to arrange financing for a loan purchase and that such services ceased upon collapse of the loan transaction. The defendants aver that the plaintiffs must show that the defendants owed a duty of care after September 15, 1996, the date that their employer, Bibeau, left the employment of RL; that the defendants used specific information for a specific purpose; and that RL was disadvantaged as a result of the alleged misuse.
Section 5-3.1-23(a) states in pertinent part:
 "No licensee . . . shall disclose any confidential information obtained in the course of a professional engagement except with the written consent of the client or former client. . . ."
A licensee is defined as " [t]he holder of a certificate, authority or permit issued under this chapter or under the prior laws of this state." R.I.G.L. § 5-3.1-3(5).
In Rhode Island, it is well settled that in order to effectuate the Legislature's intent, our Supreme Court examines a statute in its entirety and gives the words their plain and ordinary meaning. In re Falstaff Brewing Corp., 637 A.2d 1047, 1049 (R.I. 1994). When a statute has a plain, clear, and unambiguous meaning the Legislature's intent is gleaned from the plain and literal language contained therein. Parkway Associatesv. Godfrey, 688 A.2d 1289, 1294 (R.I. 1997). If a mechanical application of a statutory definition produces an absurd result or defeats the Legislature's intent our Supreme Court will look beyond mere semantics and give effect to the purpose of the act.In re Falstaff Brewing Corp., 637 A.2d at 1050. The primary task in construing a statute is to attribute to the enactment the meaning most consistent with its policies and with the obvious purposes of the Legislature. Id. It is clear from a reading of § 5-3.1-23, that the obvious purpose of the statute is to protect the clients and former clients of accountants from disclosure of confidential information obtained by such accountants in the course of their employment.
This Court is satisfied that Brier is a licensee within the meaning of R.I.G.L. § 5-3.1-3(5) and that Brier and Brier 
Co. were employed directly by RL, not by Bibeau. RL directly paid all of the defendants' compensation. As RL's accountant, Brier had access to business records of the corporation. The fact that these accounting services ceased upon collapse of the buyout is irrelevant to the inquiry as to whether any of RL's confidential information was disclosed. To permit an accountant such as Brier to disclose confidential information after his employment with RL ceased would defeat the plain meaning and purpose of the statute.
The relationship between an accountant and his client has been held to be one of confidentiality . . .; however, . . . it does not extend the common law attorney-client privilege to the accountant-client privilege. Agra Enterprises v. Brunozzi,448 A.2d 579, 582 (Pa. Super. 1982). The defendants argue that AgraEnterprises, is analogous to the case at bar. In that case, an accountant, who worked for the plaintiff and became familiar with the plaintiff's operation, set up a directly competing company after ceasing his employment with the plaintiff. The accountant subsequently hired a former employee of the plaintiff who, like Bibeau, had signed a non-compete agreement. The Pennsylvania Court found that although the defendant had used the considerable knowledge which he had gained about the plaintiff's business in his own company, `[h]e had signed no restrictive covenant, however, and thus would be entitled to use any skills and knowledge acquired unless his knowledge amounted to "confidentialinformation.'" Agra, 448 A.2d at 582 (emphasis added).
The record and testimony before this Court indicate that Brier disclosed confidential information belonging to his former client, RL, to CSI, in violation of R.I.G.L. § 5-3.1-23(a). In the business plan which he compiled and submitted to First Bank and Trust on behalf of CSI, Brier himself stated that "[a]ll financial information is based on former projections calculated for a competitor who was approved for an S.B.A. loan." Brier later admitted that the competitor mentioned in the report was indeed RL, but that he did not use any of its confidential information and that he had merely used his accounting experience, coupled with information which is readily available in the industry, to make his calculations.
This Court is not persuaded by Brier's argument. CSI's business plan specifically stated that the plan was based on "former projections." Projections are not made out of thin air but, instead, are based on concrete figures, and in this case, figures derived from RL's confidential information. The fact that CSI's business plan is based on former projections calculated for RL, is a direct admission by Brier, a licensee, that he disclosed RL's confidential information to CSI in violation of R.I.G.L. § 5-3.1-23(a). Furthermore, there is no evidence in the record that Brier Co. disclosed any confidential information to CSI. Brier Co., is not a licensee within the meaning of the Act and cannot be found directly liable under R.I.G.L. § 5-3.1-23(a). The plaintiffs have failed to present any compelling evidence to justify piercing the corporate veil. Thus, only Brier is liable under this count.
5. Damages
(a) Compensatory Damages
The plaintiffs seek compensatory damages for profits allegedly lost by reason of the actions by the defendants, Brier and CSI. The plaintiffs allege that they lost profits when CSI misappropriated RL's trade secrets and interfered with its prospective business relations. Specifically, the plaintiffs allege that they lost profits when CSI took the business of PY Small Boats and when RL had to reduce its prices in response to the bids made by CSI. In addition, McFarland alleges that the value of his stock in RL decreased as a result of the tortious interference by Brier and CSI with the mutual non-compete agreement, and seeks compensation for the resulting loss.
(i) Lost Profits
The basic precondition for the recovery of lost profits is that such a loss be established with reasonable certainty. Longv. Atlantic PBS, Inc., 681 A.2d 249, 253 (R.I. 1996). Although mathematical precision is not required, the [finder of fact] should be provided with some rational model of how the lost profits occurred and on what basis they have been computed. Id. The measure of damages is the loss to [the plaintiff]. Id. Actual damages include both lost sales and price erosion. Roton Barrier,Inc., v. Stanley Works, 79 F.3d 1112, 1120 (Fed. Cir. 1996). However, an aggrieved party is prohibited from recovering damages that he or she could have reasonably avoided. Bibby'sRefrigeration, Heating Air Conditioning v. Salisbury,603 A.2d 726, 729 (R.I. 1992) The defendant has the burden of proving that the plaintiff failed to mitigate. Id.
This Court finds credible the testimony of McFarland when he stated that the markup in effect during Bibeau's tenure as president had been 40 percent; that RL intended to reduce this markup to 35 percent; and that in response to bids made by CSI to RL's customers, RL was, in fact, forced to reduce the markup to 30 percent. Catherine Parente (Parente), the plaintiffs' expert and a witness whose testimony this Court finds particularly compelling, testified that the lost gross profit expressed as a percentage of sales was 7.69 percent. Parente applied this calculation to the actual sales figures for T.P.I., Alden Yachts, Globe Manufacturing and reached a figure of $125,582 in lost profits as a result of RL's reduced prices. Parente also calculated the profits which RL lost as a result of losing PY Small Boats to be $25,317. The total loss of profits to RL, based on these calculations, is $150,899.
Although Parente incorrectly calculated commission for the salesmen in her report, this Court finds her methodology to be correct, and finds that this mistake has been corrected by the figures submitted by the plaintiffs in their post-trial brief. The amended figures represent lost profits as a result of decreased prices as $125,165, and lost profits from PY Small Boats as $20,216. Additionally, the plaintiffs include lost profits as a result of the sale of belts to Globe Manufacturing in September, 1995, which total $5,998. The total amount of lost profits claimed by RL from Brier and CSI for the tortious interference with the non-compete agreement and tortious interference with RL's prospective business advantage is $151,380.
This Court further finds that although the plaintiffs had a duty to mitigate damages, they did not do so. RL could have, and should have, increased its profit margin to 35 percent, during the period that CSI was enjoined from competing with RL. The annualized lost net profit for T.P.I., Alden Yachts, and Globe Manufacturing, based on the adjusted figures above, is $83,443, and this figure represents the amount that the plaintiffs could have mitigated during the one year injunction period and which must be deducted from the $125,165 figure above to reach a total of $41,722. This represents lost profits as a result of decreased prices. With regard to PY Small Boats and the sale of belts to Globe Manufacturing, mitigation is not an issue because the $20,216 and $5,998 represent actual lost profits, so those figures will remain unchanged. When both sets of figures for lost profits are added together, they total $67,936, and represent the damages for which Brier and CSI are jointly and severally liable.
(ii) Loss in the Value of the Read and Lundy Stock
As a result of the tortious interference with the non-compete agreement, McFarland claims that there was a loss in the value of his stock in RL. Much testimony was elicited concerning the value of RL before and after the interference, and what constitutes the correct method for calculating loss directly attributable to the interference. There was a great deal of dispute as to how the inventory was calculated and how accurate the financial statements were during Bibeau's tenure as president.
Although it is true that where uncertainty with respect to a damages award is caused by the defendant's conduct, that uncertainty will not bar a judgment for damages, Story ParchmentCompany v. Paterson Company, 282 U.S. 555, 568 (1931), uncertainty in damage calculations as a result of the defendant's conduct is not the deciding issue in this instance. Regardless of whether the plaintiff showed a diminution in value of his stock, or whether he used the correct methodology in reaching his figures, the figures themselves are seriously flawed because they do not account for the plaintiff's own failure to mitigate. As the plaintiff has failed to show his damages with respect to the loss in the value of his stock with any reasonable degree of certainty, these damages must be denied.
(iii) Exemplaly and Punitive Damages
The plaintiffs allege that the defendants' conduct was so egregious that it justifies an award of punitive damages.
The standard in Rhode Island for imposing punitive damages is rigorous and will be satisfied only in instances wherein the defendants' conduct requires deterrence and punishment over and above that provided in an award of compensatory damages.Palmisano v. Roth, 624 A.2d 314, 318 (R.I. 1993). An award of punitive damages is considered an extraordinary sanction and is disfavored in the law, but it will be permitted if awarded with great caution and within narrow limits. Id.
Although the defendants' conduct was reprehensible, this Court does not find that it rises to the egregious level required for an award of punitive damages and believes that the award for compensatory damages is sufficient as punishment for the defendants' behavior.
(b) Injunctive Relief
The plaintiffs seek this Court to permanently enjoin Brier and CSI from competing with RL under each count of the complaint.
The purpose of an injunction is not to punish the wrongdoer for past transactions, but to restrain present or threatened future wrongful acts. Rego Displays, Inc. v. Fournier,119 R.I. 469, 477, 379 A.2d 1098, 1102 (1977). As a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violations. MaiSystems Corporation v. Peak Computer, Inc., 991 F.2d 511, 520 (9th Cir. 1993). In the case of a non-compete agreement, "[b]ecause the intent of the injunction is in large measure to maintain the balance of trade, the restraint on the defendant should last only so long as is necessary to recreate fair conditions". Rego Displays, 119 R.I. at 477, 379 A.2d at 1103. Rarely does this time extend beyond several years, and certainly this limit does not foreclose the defendant from all future solicitation. Id. In the context of a covenant not to compete, "[a] company in competition with the covenantee knowing of the restrictive covenant may also be enjoined." Home Gas Corporationof Massachusetts v. DeBlois Oil Company, 691 F. Supp. 567, 576 (D.R.I. 1987).
In the instant matter, the defendants, Brier and CSI, have been found liable for tortious interference with Bibeau's non-compete agreement with McFarland, and for tortious interference with the prospective business advantage of RL. The Federal District Court enjoined Bibeau from competing with RL for three years with respect to the products sold to its clients, customers or accounts existing as of September 20, 1995. As RL has already been awarded all established compensatory damages, it is equitable that only the same injunction should apply to CSI and Brier.
Section 6-41-2 of the Trade Secrets Act, authorizes injunctive relief in misappropriation cases, such as the instant one. The defendants are hereby permanently restrained and enjoined from retaining, using, or disclosing directly or indirectly any of RL's customer lists or records, any information obtained from RL's customer lists or other records or any other information to which CSI, Brier or Brier Co. were privy by reason of their acquaintance with Bibeau, or in the case of the latter two, by reason of their employment by or position at RL which relates to RL's customers, customer product requirements, customer credit history, product costs, product sources, identity of vendors, capabilities of vendors and the availability of discounts from vendors. This injunction is limited to information which is stored in magnetic or electronic form or computer tape, disk, hard copy or otherwise.
Counsel shall submit the appropriate judgment for entry.